ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>v.<br><br>GILBERTO MASS BANCHS<br><br>Apelante | KLAN202000407 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Ponce<br><br>Civil Número:<br>JLA2016G0127<br>JLA2016G0128<br>JLA2016G0129<br>JLA2016G0130<br>JVI2016G0027<br>JVI2016G0028<br>JVI2016G0029<br><br>Sobre: Daños y Art. 504 LA<br>Art. 5.15 LA (3 casos)<br>Art. 93 (A) Código Penal (3 casos)<br><br>Sobre: Delito contra la vida |

Panel integrado por su presidenta la Juez Ortiz Flores, la Juez Álvarez Esnard y el Juez Ronda Del Toro

**Ronda Del Toro, Juez Ponente**

# SENTENCIA

En San Juan, Puerto Rico, a 27 de noviembre de 2023.

El 14 de julio de 2020, el Sr. Gilberto Mass Banchs (Sr. Mass o Apelante), presentó el recurso de Apelación que tenemos ante nuestra consideración. En este nos solicita que revoquemos las Sentencias dictadas el 20 de febrero de 2020 por el Tribunal de Primera Instancia, Sala de Ponce (TPI). Mediante las mismas, dicho foro declaró al Apelante culpable de dos cargos de asesinato en primer grado, dos tentativas de asesinato en primer grado, un cargo por portar un arma de fuego sin licencia, y tres cargos por

apuntar y disparar un arma de fuego, y lo sentenció a cumplir una pena de 137 años de cárcel.[1]

Examinadas las comparecencias de las partes, los autos originales, la transcripción de la prueba oral estipulada (TPO), así como el derecho aplicable, confirmamos las Sentencias apeladas.

## I.

Por hechos ocurridos en Ponce el 10 de abril de 2016, el Ministerio Público presentó acusaciones contra el Sr. Mass por asesinato en primer grado (2 cargos), en violación al Artículo 93 (a) del Código Penal de Puerto Rico, 33 LPRA sec. 5142; tentativa de asesinato (2 cargos), estatuido en el Artículo 93 (a) del Código Penal, *supra*; posesión de arma de fuego sin licencia (1 cargo), en contravención del Artículo 5.04 de la Ley Núm. 404-2000, Ley de Armas de Puerto Rico, 25 LPRA ant. sec. 458c; y disparar o apuntar un arma de fuego (3 cargos), en violación a la Ley Núm. 404-2000, 25 LPRA ant. sec. 458n.[2]

Luego de varios trámites, el 14 de julio de 2016, el Sr. Mass solicitó la supresión de su identificación realizada en una rueda de confrontación. Alegó, que el proceso para identificarlo estuvo viciado y fue sugerido por la policía.[3]

---

[1] Las Penas de Asesinato y Tentativa de Asesinato se cumplirán, según lo dispuesto por el TPI, de manera concurrentes entre sí. Mientras que las Penas bajo la Ley de Armas de Puerto Rico se cumplirán consecutivas entre sí y consecutivas con las Penas de Asesinato y Tentativa de Asesinato. Véase Autos Originales.

[2] Casos Criminales número JLA2016G0127 al JLA2016G0130 y JVI2016G0027 al JVI2016G0129. Posteriormente, se enmendaron las acusaciones en los señalamientos del 27 de marzo y 10 de julio de 2019:
**Vista del 27 de marzo de 2019**, págs. 4-5: el TPI declaró ha lugar la solicitud del Ministerio Público para enmendar la acusación en el caso JLA2016G0129, Artículo 5.15 de la Ley de Armas, contra el Sr. Mass, a los efectos de que donde indica: "apuntó con un arma de fuego" diga "apuntó y **disparó**".
**Vista del 10 de julio de 2019**, págs. 2-5: el TPI declaró ha lugar la solicitud del Ministerio Público para enmendar todas las acusaciones, a los efectos de que donde indica: 1) "El referido acusado, Gilberto Mass Banchs, allá en o para el día 10 de abril de 2016, a las 9:28 p.m., en Ponce" diga "**aproximadamente** a las 9:28 p.m., en Ponce"; y 2) "apuntó y disparó con un arma de fuego color negra con peine largo" diga "**pistola** color negra con peine largo".

[3] Véase, Solicitud de Supresión de Identificación, Autos Originales JLA2016G0027, Tomo I, págs. 94-98.

El 3, 10, 16 y 17 de agosto de 2016, se celebró la vista de supresión de identificación en la cual, en consideración a la prueba presentada y los argumentos de las partes, el TPI denegó la supresión solicitada.[4] El Sr. Mass no recurrió de ese dictamen, por lo que advino final y firme.

Así las cosas, se celebró juicio por Tribunal de Derecho.[5] Durante el juicio, el Ministerio Público presentó los siguientes

---

[4] Véase, Resolución del 29 de agosto de 2016, Autos Originales JLA2016G0027, Tomo I, págs. 168-172.

[5] Según surge de la TPO, se celebró juicio los días 28 de septiembre y 28 de octubre de 2016; 19, 24 y 25 de enero de 2017; 6 de abril de 2017, 25 de mayo de 2017, 13, 17 y 18 de julio de 2017; 12 de septiembre de 2017; 29, 30 y 31 de enero de 2018; 23 de abril de 2018; 2 de mayo de 2018; 5 y 7 de junio de 2018; 2, 30 y 31 de julio de 2018; 1, 2 y 6 de agosto de 2018; 9, 10 y 11 de octubre de 2018; 19 y 26 de marzo de 2019; 22, 23, 29 y 30 de mayo de 2019; 10, 12 y 13 de junio de 2019; 10 y 11 de julio de 2019; 10, 11, 12 y 25 de septiembre de 2019; y 1 de octubre de 2019.
**Vistas del 25 de mayo y 17 de julio de 2017**: los señalamientos estuvieron dedicados a la producción de documentos y fueron marcados como Exhibits 14 al 32 del Ministerio Público sin objeción de la Defensa. Además, se estipuló la cadena de custodia de los Exhibits 14 y 15 (análisis de proyectiles) que el Investigador Forense Javier Ríos Rosa llevó al Instituto de Ciencias Forenses en Ponce, entre otros documentos. Véase Tomo titulado "Revisión" de las págs. 13-41 del señalamiento de la vista del 25 de mayo de 2017, págs. 21-22.
**Vista del 23 de abril de 2018:** el señalamiento estuvo dedicado a la presentación y estipulación de varios documentos que fueron marcados como Exhibits del Ministerio Público. Además, se estipuló y se vertió para el récord los testimonios de los siguientes testigos de cargo (cadena de control y custodia y prueba acumulativa): 1) Sra. Annette Santiago Ramos del Departamento de Manejo de Información del Hospital San Lucas de Ponce; 2) Agente Reynaldo Rodríguez Martínez de la División de Servicios Técnicos de la Policía de Puerto Rico; 3) Sra. Yamaira Falú Carrasquillo, Técnica de Control y Custodia del Instituto de Ciencias Forenses; 4) Sra. María Hernández Miranda, Técnica de Control y Custodia del Instituto de Ciencias Forenses; 5) Sr. Rafael Vélez Díaz, Técnico de Control y Custodia de Evidencia del Instituto de Ciencias Forenses; 6) Sr. Omar Ortiz Reyes, Técnico de Control y Custodia del Instituto de Ciencias Forenses; 7) Sra. Rosa Guerrero, Técnica de Sala de Autopsias del Instituto de Ciencias Forenses; 8) Sr. Félix Vázquez Solís, Técnico de Control y Custodia del Instituto de Ciencias Forenses; 9) Sr. Benjamín Acosta García, Supervisor del Área de Control y Custodia de Evidencia del Instituto de Ciencias Forenses; 10) Sra. Evelyn Medina Conde, Administradora de Documentos Públicos del Sistema 911; 11) Sr. Hermer Torres Rosario, Administrador de la grabación de llamadas del Sistema 911; 12) Sr. Leo Maldonado, radio operador del Sistema 911; 13) Sr. Rigo Aponte, radio operador del Sistema 911; y 14) Sr. Gil Martínez Sosa, Investigador Forense del Instituto de Ciencias Forenses en Ponce para la fecha de los hechos. Véase Tomo titulado "revisión" de las págs. 1-50 del señalamiento de la vista del 23 de abril de 2018, págs. 2-47.
**Vista del 30 de abril de 2018:** en el señalamiento se marcaron los Exhibits 48-61 del Ministerio Público, sin objeción de la Defensa.
**Vista del 23 de abril de 2018:** en el señalamiento las partes estipularon los testimonios de la Sra. Wildalys Torres Santiago, Seróloga Forense del Instituto de Ciencias Forenses, y la Sra. Stephanie Erazo Peña, Examinadora Forense de Evidencia Digital del Instituto de Ciencias Forenses. Además, estipularon los Exhibits 13 al 17: Certificado de Análisis de Sección de Evidencia Digital Número ED-16-0030; Reporte de Adquisición UFED Physical Analyzer; Reporte de Adquisición con UFED Physical Analyzer, Versión 5.1.0, 5.1.0.201 de las piezas ICF2016-003183-014, que consiste en un teléfono celular marca ZTE, Modelo 9, Modelo Z958, con Número de Serie 325853030284, color negro con batería tarjeta SIM, marcada como pieza ICF2016-003183-0014A de la compañía AT&T para el Número 1-787-718-1158; Curriculum Vitae de la Seróloga Forense

testigos de cargo: 1) Sra. Emma Ramírez Torres (Investigadora Forense); 2) Sra. Evelyn Ortiz Mangual (madre del occiso Andrés Javier Vargas Ortiz); 3) Sr. Esteban Luna Vargas (padre del occiso Jossie Esteban Luna Guzmán); 4) Sr. Javier Ríos Rosa (Investigador Forense); 5) Sra. Yesenia López Vega (Investigadora Forense); 6) Agente Abiú Torres Rodríguez; 7) Sra. Miositis Meléndez Mercado (pareja de Andrés y testigo de los hechos); 8) Sra. Zuleyka Rodríguez Colón (pareja de Jossie); 9) Agente Angélica García Pizarro; 10) Agente Pablo J. Vélez Blay; 11) Sr. José Luis Pérez González (dueño previo del Colmado Pérez); 12) Sr. José Luis Pérez Rodríguez (dueño del Colmado Pérez al 10 de abril de 2016); 13) Agente Noel Ortiz Vargas; 14) Wilkins Quintana Fraticelli (Paramédico); 15) Dr. Luis M. Cintrón Roura (Emergenciólogo); 16) Agente Rebeca Rosado Rodríguez; 17) Sra. Aracelis Echevarría Rivera (Seróloga); 18) Sr. Antonio Matías Rodríguez (Químico Forense); 19) Dra. Rosa M. Rodríguez Castillo (Patóloga Forense); 20) Sr. Abdiel Ramírez Negrón (Examinador de Armas de Fuego). Por su parte, la Defensa, presentó los testimonios del Sr. Wilfredo Rivera Marrero (confinado acusado de un doble asesinato); y el Sr. José Rivera Navarro (empleado de la Compañía Claro).

A continuación, resumiremos los testimonios vertidos durante el juicio:

---

Wildalys Torres Santiago; y Curriculum Vitae de la Examinadora Forense de Evidencia Digital Stephanie Erazo Peña.

**Vista del 10 de septiembre de 2019**: en este señalamiento se corrigieron los Exhibits 72 y 56 para que indicaran que son del Ministerio Público y el Exhibit 5 de la Defensa para que se anotara en la hoja de registro que es evidencia ilimitada luego de celebrarse la Regla 109 de Evidencia y conforme a la resolución de la Juez Brenda Vera. Además, se aclaró el lenguaje de la Minuta del 10 de julio de 2019, para conformarla a las enmiendas de todas las acusaciones. Concluida la presentación de la prueba, el Ministerio Público dio por sometido su caso. Por su parte, la Defensa solicitó presentar prueba de refutación con el testigo, Sr. Wilfredo Rivera Marrero, para impugnar la veracidad de lo declarado por la Sra. Miosotis Meléndez. El Ministerio Público objetó. Las partes argumentaron ampliamente y el Tribunal determinó que el testigo declare y el tribunal le dará el peso correspondiente.

**A. Resumen de la prueba testifical del Ministerio Público:**

**1. Sra. Emma Ramírez Torres** (Investigadora Forense Ramírez) (Vistas del 28 de septiembre y 28 de octubre de 2016, 19, 24 y 25 de enero de 2017 y 5 de abril de 2017)

La Investigadora Forense Ramírez Torres trabaja en el Instituto de Ciencias Forenses (ICF) en Ponce. El 10 de abril de 2016 su turno era de 10:00 pm a 6:00 am.[6] Declaró que ese día la Policía de Puerto Rico llamó a su oficina y le indicaron que necesitaban de sus servicios porque había ocurrido un crimen.[7] Expresó que fue la Investigadora Auxiliar de la escena del crimen en la Carretera 503, kilómetro 0.9, Sector Aguacate, Barrio Tibes frente al Colmado Pérez.[8] Reveló que, al llegar a la escena el 10 de abril de 2016, a las 11:42 pm, observó los cuerpos de dos hombres, uno sobre el pavimento y el otro sobre la gravilla.[9] Añadió que la escena estaba custodiada por la policía y que el personal del ICF se encargó de establecer un perímetro para proteger la escena.[10] Respecto a los cuerpos, indicó que tenían heridas de aparente proyectil de bala y manchas de sangre.[11] Indicó que, al llegar a la escena, observó casquillos de balas disparados, proyectiles y sus derivados.[12] Señaló que identificó las piezas de evidencia en el lugar y documentó la escena en fotos y videos.[13] Abundó que, mientras tomaba las fotografías, el Investigador Primario Javier Ríos Rosa preparaba un croquis de la escena y el Informe de Hallazgos de Escena.[14] El Tribunal admitió como Exhibits 1 al 3 del Ministerio Público las fotos y dos discos con videos de la escena, sin objeción de la Defensa.[15]

---

[6] TPO del 28 de octubre de 2016, pág. 9.
[7] *Íd.*, pág. 10.
[8] *Íd.*, págs. 11 y 16.
[9] *Íd.*, págs. 10 y 12.
[10] *Íd.*, pág. 13.
[11] *Íd.*, págs. 14-15.
[12] *Íd.*, págs. 15-16.
[13] *Íd.*, págs. 16-17.
[14] *Íd.*, págs. 19-20.
[15] *Íd.*, págs. 22-24.

Respecto a los dos cadáveres, indicó que el occiso Jossie Esteban Luna Guzmán (occiso Luna Guzmán o Jossie) estaba sobre el pavimento y el occiso Andrés Javier Vargas Ortiz (occiso Vargas Ortiz o Andrés) estaba sobre una gravilla blanca a orillas de la carretera, frente al Colmado Pérez.[16] Continuado el examen directo, la testigo indicó que el occiso Vargas Ortiz vestía una camisa roja, pantalón mahón largo azul y calzado deportivo rojo.[17] Mientras, el occiso Luna Guzmán vestía una camisa negra, pantalón mahón largo azul claro y calzado deportivo gris y negro.[18] Abundó que, como parte de la evidencia recolectada en la escena, se localizó una gorra color negro y azul,[19] un plomo, un proyectil deformado, un fragmento de blindaje (parte inferior de un proyectil),[20] varios casquillos de bala disparados,[21] una cadena eslabonada dorada, una gorra verde y negro con un logo de Chicago Bulls, un celular negro y un guante plástico azul.[22] También observó varias manchas de aparente sangre.[23] Reveló que el occiso Luna Guzmán tenía heridas de aparente proyectil de bala. En su mayoría, en la oreja y la sien izquierda, el cuello del lado izquierdo, en la parte media del pecho, cerca de la tetilla izquierda, en la parte superior del brazo derecho, cerca del ombligo, en la mano izquierda cerca del dedo pulgar, en la espalda parte inferior lado derecho y parte media, en la parte de atrás de la cabeza parte superior, en la nuca en la parte inferior y la parte superior área media.[24] En cuanto al occiso Vargas Ortiz precisó que este tenía varias heridas de aparente proyectil de bala en el

---

[16] *Íd.*, págs. 27-28.
[17] TPO del 19 de enero de 2017, págs. 11-12.
[18] *Íd.*, pág. 13.
[19] *Íd.*, pág. 46.
[20] *Íd.*, pág. 49; TPO del 24 de enero de 2017, pág. 17.
[21] TPO del 19 de enero de 2017, págs. 50-53.
[22] *Íd.*, págs. 53-54 y 57.
[23] *Íd.*, págs. 54-55.
[24] TPO del 24 de enero de 2017, págs. 9-20.

brazo derecho, alrededor de la tetilla derecha y cerca de la tetilla izquierda, bajo la axila derecha, en el pecho, en el abdomen parte superior al lado izquierdo, en la parte superior de la mano derecha, en el brazo izquierdo y derecho, en la espalda al lado izquierdo y derecho, en la parte superior del muslo derecho posterior y en la palma de la mano derecha.[25]

Además de los cuerpos, la Investigadora Forense Ramírez Torres describió varias de las fotografías mostradas por el Ministerio Público relacionadas al Colmado Pérez, varios vehículos, manchas de aparente sangre, casquillos y blindajes de armas de fuego.[26] En fin, la testigo ratificó que la evidencia fotográfica que le mostró el Ministerio Público era un reflejo fiel y exacto a la escena que trabajó.

En el contrainterrogatorio y redirecto, la Investigadora Forense Ramírez Torres declaró sobre cómo era el alumbrando en la escena del crimen.[27]

**2.    Sra. Evelyn Ortiz Mangual** (Sra. Ortiz Mangual) (Vista del 6 de abril de 2017)

La Sra. Ortiz Mangual declaró que es la madre del occiso Vargas Ortiz. Narró que, para el 10 de abril de 2016, cerca de las 8:30 am, recibió una llamada de su hija Yesenia Vargas al teléfono de su esposo y padre del occiso Vargas Ortiz, el Sr. Andrés Vargas Texeira (Sr. Vargas Texeira), quien se encontraba durmiendo en el dormitorio de ambos, y le informó que habían matado a su hijo Andrés.[28] La testigo comenzó a gritar y llamó al Sr. Vargas Texeira, quien se despertó desesperado. Procedió a llamar al teléfono de su hijo, pero éste no contestó. El Sr. Vargas Texeira corrió para la

---

[25] *Íd.*, págs. 23-34 y 39.
[26] *Íd.*, págs. 34-48.
[27] TPO del 5 de abril de 2017, págs. 3-80.
[28] TPO del 6 de abril de 2017, págs. 5-7 y 10.

casa del vecino. Estos llamaron a su hijo y, en un momento dado, Miosotis (pareja consensual del occiso Vargas Ortiz) contestó el teléfono y les dijo que "mataron a Andrés".[29] Declaró que, Miosotis no sabía explicarles dónde estaba porque no conocía el lugar. Con la ayuda de un policía, Miosotis pudo indicar cómo llegar al lugar.[30] Con esa información, el Sr. Vargas Texeira y el vecino fueron al lugar de los hechos. La Sra. Ortiz Mangual se quedó en su casa.[31] Añadió que el Sr. Vargas Texeira no pudo llegar hasta donde estaba su hijo porque le dio un dolor bien fuerte en el pecho y no quería verlo muerto. Su hermana, la Sra. Ivonne Ortiz Mangual, fue quien identificó al occiso Vargas Ortiz en la escena.[32] Posteriormente, el 12 de abril de 2016, la testigo y su hermana fueron al ICF en Ponce a identificar al occiso Vargas Ortiz mediante fotografía.[33]

En el contrainterrogatorio, la Sra. Ortiz Mangual explicó que Miosotis estaba con el occiso Vargas Ortiz la noche de los hechos y fue quien contestó el teléfono de su hijo.[34] Añadió que Miosotis nunca le dijo lo que sucedió esa noche, porque ella estaba gritando histérica y solo gritó que "mataron a Andrés".[35]

**3.      Sr. Esteban Luna Vargas** (Sr. Luna Vargas) (Vista del 6 de abril de 2017)

El Sr. Luna Vargas declaró que es el padre del occiso Luna Guzmán. Que, para el 10 de abril de 2016, en horas de la noche, estaba en su casa durmiendo cuando un amigo llamado "Macho" lo llamó desde el balcón de su casa y le dijo que habían matado a Jossie en Tibes. Su amigo lo llevó al lugar de los hechos. Al llegar, cerca de las 10:30 pm, observó que había mucha gente y el área

---

[29] *Íd.*, págs. 7-10; Contrainterrogatorio, págs. 27-29.
[30] *Íd.*, pág. 8; Contrainterrogatorio, pág. 29.
[31] *Íd.*, págs. 9-10.
[32] *Íd.*, pág. 10.
[33] *Íd.*, págs. 12-16.
[34] *Íd.*, pág. 28.
[35] *Íd.*, pág. 29.

estaba acordonada con una cinta amarilla. Vio en el lugar al Sr. Vargas Texeira, quién le dijo que mataron a su hijo y a Jossie. Añadió que observó a su hijo en una bolsa con "zipper" plástico sobre una camilla. Identificó a su hijo en la escena y luego, el 12 de abril de 2016, fue al ICF en San Juan a identificar al occiso Luna Guzmán mediante fotografía.[36]

**4.      Sr. Javier Ríos Rosa** (Investigador Forense Ríos Rosa) (Vistas del 13 y 17 de julio de 2017)

El Investigador Forense Ríos Rosa trabaja en el ICF en Ponce hace 15 años. El 10 de abril de 2016 su turno era de 10:00 pm a 6:00 am.[37] Declaró que ese día fungía como Investigador Forense Primario y que recibió una llamada de su supervisor Sr. Víctor Pérez cerca de las 10:40 pm, informándole que había ocurrido un asesinato en el Barrio Tibes, Carretera 503, kilómetro 0.9 en Ponce.[38] Declaró que acudió a la escena junto a la Investigadora Forense Ramírez Torres aproximadamente a las 11:42 pm.[39] Reveló que, en la escena, estaba el Agente Abiú Torres Rodríguez custodiando la escena, y la Agente Rebeca Rosado Rodríguez, Agente Investigadora de la División de Homicidios en Ponce.[40] Manifestó que en el lugar preparó dos Informes de Hallazgos de Escena, uno por cada persona fallecida, dos croquis de la escena y una tabla de medidas de la escena.[41] Declaró que la iluminación en la escena era regular, provenientes de dos postes de alumbrado eléctrico y la iluminación frente del Colmado, lo cual le permitió ver las piezas de evidencia y los dos occisos en la escena.[42] El Investigador Forense Ríos Rosas aseveró que en la

---

[36] *Íd.*, págs. 37-44.
[37] TPO del 13 de julio de 2017, pág. 5.
[38] *Íd.*, págs. 6-7.
[39] *Íd.*, pág. 8.
[40] *Íd.*, págs. 9-10.
[41] *Íd.*, págs. 12-13 y 16.
[42] *Íd.*, págs. 13-14; TPO del 17 de julio de 2017, pág. 27.

escena del crimen habían varios vehículos. También indicó que los occisos estaban boca arriba, uno en el pavimento y el otro sobre la gravilla al lado de un vehículo. Expresó que ambos occisos presentaban heridas de aparente proyectil de bala.[43]

De acuerdo con el Informe de Hallazgos de Escena, caso PAT 1743-16 relacionado con el occiso Luna Guzmán (Exhibit 30 del Ministerio Público), la escena del crimen era "una zona rural a orillas de una carretera pública con tránsito en ambas direcciones". "[S]e ubicaba a un lado de la carretera cerca de residencias y justo al frente a un negocio de ventas de bebidas alcohólicas". "[E]l occiso número uno [Luna Guzmán] se localizó en el pavimento boca arriba y el occiso número dos [Vargas Ortiz] se localizó sobre la gravilla a orillas de la carretera boca arriba".[44] Subsiguientemente, identificó en el Exhibit 30, las aparentes manchas de sangre que observó en la escena.[45] Del Informe de Hallazgos de Escena, preparado por el Investigador Forense Ríos Rosas también se desprende que se recobró de la escena 32 casquillos de bala disparados de calibre .40, dos proyectiles, cuatro blindajes, cuatro fragmentos de blindaje, dos plomos y un fragmento de plomo.[46] Además, en la escena encontraron dos celulares negros, marca ZTE, uno a simple vista y el otro en un bolsillo del occiso Luna Guzmán, y una gorra de tela negra y verde con emblema de toro marca Mitchell and Ness.[47]

En cuanto al occiso Luna Guzmán, observó que este vestía una "tshirt" color negro, mahón largo color azul, medias cortas color negro, calzoncillos largos color vino con franjas grises, una correa de tela color negro con hebilla plateada y calzado deportivo

---

[43] TPO del 13 de julio de 2017, pág. 15.
[44] *Íd.*, pág. 18.
[45] *Íd.*, pág. 20.
[46] *Íd.*, pág. 21.
[47] *Íd.*, pág. 22.

negro, verde, gris y blanco.[48] Además, este tenía varias heridas causadas por proyectiles de bala. En el lado izquierdo del cuerpo tenía tres heridas, "una en la parte arriba, una por la oreja, una por el cuello" y "en la parte del frente observamos una".[49] También observó cuatro heridas de aparente proyectil de bala en el brazo derecho, en el pecho en la parte superior derecha y la parte izquierda y en el abdomen.[50] En la espalda observó seis heridas: dos aparentes laceraciones, una en la parte trasera de la cabeza y otra en la espalda hacia el lado medio izquierdo; y cuatro de aparente proyectil de bala, una por el codo derecho, una sobre el glúteo derecho, una cerca del omoplato derecho y una en la parte trasera del cuello hacia el lado izquierdo.[51]

Conforme al Informe de Hallazgos de Escena, identificó dos vehículos relacionados a los hechos: una Toyota Tacoma que tenía casquillos de bala disparados calibre .40 en diferentes lugares: seis en el parabrisas, cuatro sobre el bonete y otros más debajo del vehículo. Además, el Toyota Corolla color gris tenía una pieza de evidencia de aparente mancha de sangre entre el guardalodo y el "bumper" del lado izquierdo. Dichos vehículos estaban ubicados juntos frente al Colmado, entre los cuales estaba el occiso Luna Guzmán.[52] Mientras, el occiso Vargas Ortiz estaba ubicado en la gravilla, a la izquierda del Toyota Corolla gris.[53] En el mismo Informe se documentó que frente al Colmado también había un vehículo Mitsubishi Nativa rojo y un Honda Civic que fueron fotografiados.[54] El Investigador Forense Ríos Rosas declaró que la evidencia recopilada la entregó al ICF en San Juan para el

---

[48] *Íd.*, pág. 24.
[49] *Íd.*, págs. 27-28.
[50] *Íd.*, pág. 28.
[51] *Íd.*, pág. 29.
[52] *Íd.*, págs. 30-33.
[53] *Íd.*, pág. 31.
[54] *Íd.*, pág. 33.

análisis correspondiente.[55] Luego, el testigo identificó los Exhibits 14 al 32 del Ministerio Público como todas las piezas y muestras levantadas en la escena, los recibos de cuando los entregó en el ICF, los croquis y los informes que preparó.[56] Además, se abrió el sobre sellado del Exhibit 12 de Ministerio Público, el cual tenía en su interior tres sobres: el primero, con un celular marca ZTE; el segundo, con otro celular de la misma marca, ambos ocupados por el Investigador Forense Ríos Rosas en la escena; y el tercero, con un aplicador de una muestra de aparente sangre. Cada uno fue admitido como Exhibits 34, 35 y 36, sin objeción de la Defensa. Los tres artículos fueron llevados al ICF en San Juan y el formulario "Solicitud de Servicio Forense" del ICF fue admitido como Exhibit 37 del Ministerio Público, sin objeción de la Defensa.[57]

En el contrainterrogatorio, el Investigador Forense Ríos Rosas declaró que la escena no era muy extensa y que los dos postes de luz localizados a 95' 7" uno del otro, le proveyeron la mayoría de la iluminación que utilizó. Añadió que la escena estaba entre los dos postes de luz y que al otro lado de la calle estaba el Colmado con otra iluminación.[58]

**5**.    **Sra. Yesenia López Vega** (Investigadora Forense López Vega) (Vista del 18 de julio de 2017)

En su declaración, la Investigadora Forense López Vega sostuvo que trabaja en el ICF en Ponce hace 13 años. El 24 de mayo de 2016 su turno era de 2:00 a 10:00 pm.[59] De acuerdo a su testimonio, sus funciones como Investigadora Auxiliar se limitaron a tomar fotografías a un vehículo en el estacionamiento

---

[55] *Íd.*, págs. 34-35; TPO de 17 de julio de 2017, pág. 4.
[56] TPO de 17 de julio de 2017, págs. 6-15 y 25-26.
[57] *Íd.*, págs. 15-24.
[58] *Íd.*, págs. 44-45.
[59] TPO del 18 de julio de 2017, pág. 4.

de la Comandancia de Ponce, así como asistir a la Investigadora Forense Ramírez Torres en sus gestiones[60] En particular, la testigo tomó 32 fotografías del vehículo Hyundai Accent, color rosa, tablilla IIT 711.[61] Expresó, además, que el 13 de junio de 2016, cerca de la 1:40 pm, realizó el análisis de muestra bucal, SAR-16-0204 (Exhibit 39) a la Sra. Zuleyka Rodríguez Colón. Luego, el 27 de junio de 2016, entregó el colector bucal en el ICF para el análisis correspondiente.[62]

**6.     Agente Abiú Torres Rodríguez** (Agente Torres Rodríguez) (Vistas del 18 de julio y 12 de septiembre de 2017)

El Agente Torres Rodríguez declaró que, el 10 de abril de 2016, estaba asignado al Precinto de la Policía de Puerto Rico en el sector La Rambla en Ponce.[63] Indicó que el día de los hechos le correspondió realizar patrullaje preventivo en el turno nocturno.[64] Ese día, estaba acompañado por el Sargento José Santiago Méndez y el Agente Héctor González.[65] Precisó que recibió una llamada del Centro de Mando en Ponce a través del Sistema 911, informándole que habían personas heridas en el Barrio Tibes, Sector Aguacate, Carretera 503, kilómetro 0.9, frente al Colmado Pérez.[66] Declaró que llegó a la escena a las 9:50 pm.[67] Señaló que la escena estaba iluminada con los postes de luz que había en el área. Allí "ladió" la patrulla para cerrar la carretera y sus compañeros, el Sargento José Santiago y el Agente Héctor González, pusieron una cinta amarilla para delimitar el área y proteger el perímetro.[68] El Agente Torres Rodríguez narró que

---

[60] *Íd.*, págs. 5 y 8.
[61] *Íd.*, págs. 7-8 y 14.
[62] *Íd.*, págs. 9-13.
[63] *Íd.*, págs. 15-16.
[64] *Íd.*, pág. 16.
[65] *Íd.*
[66] *Íd.*, págs. 16-18. La Defensa objetó las preguntas por ser prueba de referencia. El Juez declaró con lugar la objeción. El Ministerio Público continuó preguntando sobre lo objetado hasta que Juez permitió las preguntas.
[67] *Íd.*, pág. 19.
[68] *Íd.*, págs. 22-23.

frente al Colmado, a su mano izquierda y entre medio de dos vehículos (una "pickup" y un Toyota Corolla), había una persona muerta que estaba boca arriba tirada en el pavimento y tenía sangre en el cuerpo. Esa persona resultó ser el occiso Luna Guzmán.[69] También observó que había casquillos cerca del occiso.[70] Continuó el Agente Torres Rodríguez narrando, que identificó a una dama blanquita y llenita que estaba con el occiso, a quien le tomó los datos.[71] Esta resultó ser la Sra. Miosotis Meléndez Mercado, pareja consensual del occiso Vargas Ortiz.[72] Según declaró el Agente, Miosotis estaba llorosa, temblorosa como en "shock" y le manifestaba: "Yo lo ví" … "Yo lo vi, yo lo ví" y volvía "Lo ví, lo ví, lo ví. Yo lo ví porque entró, saludó, Yo lo ví".[73] Reiteró que Miosotis le dijo que ella, Andrés, Zuleyka y Jossie, estaban compartiendo en el Colmado. Miosotis había ido al baño y que Andrés, Jossie y Zuleyka salieron del Colmado. Luego, al ella salir y llegar hasta donde Andrés, se acercó un individuo que tenía una pistola con un cargador y les disparó. Que Andrés la empujó y ella se cayó para el área de las piedras por el lado de un vehículo marca Toyota que estaba estacionado a la orilla de la carretera.[74] Indicó, además, que Miosotis le manifestó que el individuo que les disparó lo había visto entrar y saludar en el Colmado Pérez.[75] Luego, la Agente Rebeca Rosado Rodríguez del CIC de Homicidios continuó con la investigación.[76]

El Agente Torres Rodríguez también declaró que vio a una segunda persona que resultó ser el occiso Vargas Ortiz, en el área

---

[69] *Íd.*, págs. 23-25 y 40.
[70] *Íd.*, pág. 24.
[71] *Íd.*, págs. 29-30.
[72] *Íd.*, págs. 31-32.
[73] *Íd.*, pág. 31.
[74] *Íd.*, págs. 33-34 y 36.
[75] *Íd.*, págs. 37-38.
[76] *Íd.*, págs. 42-44.

de las piedritas fuera del pavimento. Su cuerpo estaba boca arriba. En el área donde estaba el occiso había suficiente claridad, pero Forense había instalado unas lámparas "spotlights" que lo hacía más claro.[77] Observó también que en esa área había casquillos de proyectil.[78]

Por otro lado, en el Informe de Incidente Inicial de la Policía de Puerto Rico, Núm. 2016-03-458-2253 (Exhibit 41) preparado por el Agente Torres Rodríguez, este hizo constar que el occiso Vargas Ortiz vestía un pantalón mahón azul claro, "T-shirt" color rojo, tenis rojos marca Adidas, correa negra con unas letras, medias cortas negras y una cadena en eslabones plateada. También hizo constar que el occiso recibió múltiples impactos de proyectil en varias partes del cuerpo.[79] Respecto al occiso Luna Guzmán, expuso que también recibió múltiples impactos de proyectil en varias partes del cuerpo. Que era la pareja de Zuleyka y que era la persona que andaba en el Honda Civic color púrpura que estaba en el lugar de los hechos.[80] El Agente Torres Rodríguez continuó narrando las anotaciones que constaban en el Informe de Incidente Inicial.[81] Además, ratificó que la evidencia fotográfica que le mostró el Ministerio Público era un reflejo fiel y exacto a la escena que custodió.[82]

**7.     Sra. Miosotis Meléndez Mercado** (Sra. Meléndez o Miosotis) (Vistas del 29, 30 y 31 de enero de 2018)

La Sra. Meléndez era ama de casa para la fecha de los hechos y enfermera, para la fecha de su testimonio.[83] Para la fecha de los hechos llevaba tres meses conviviendo con Andrés.

---

[77] *Íd.*, págs. 46-50 y 52.
[78] *Íd.*, pág. 51.
[79] TPO del 12 de septiembre de 2017, págs. 16-19.
[80] *Íd.*, págs. 21-22.
[81] *Íd.*, págs. 21-29.
[82] *Íd.*, págs. 38-43.
[83] TPO del 29 de enero de 2018, pág. 6.

Declaró que Andrés era camionero independiente, trabajaba para Alexander Transport e importaba y exportaba para Colomer & Suárez, una compañía que lleva mercancía a los supermercados en Ponce, Sector Coto Laurel.[84] Declaró que el occiso Luna Guzmán y Andrés eran amigos desde la niñez. Que Andrés le presentó a Zuleyka en la casa de esta última como la esposa de Jossie. El día de los hechos era la tercera vez que la testigo veía a Jossie. Indicó que ella no sabía a qué se dedicaba Jossie.[85] Relató que el 10 de abril de 2016, se encontraba en su casa en horas de la tarde con Andrés cuando comenzó a sonar el celular de los dos, y al mirar la pantalla y ver que decía "Jossie nuevo", rechazó la llamada. Elaboró que ya sabía para qué llamaba; en particular, que Jossie le iba a prestar un aro con una goma de "banchi" a Andrés para que pudiera llevar el vehículo a la casa de la mamá, y llamaba para ver si le podía entregar el aro.[86] Cuando volvió a sonar el celular, se lo llevó a Andrés y se, quedó cerca mientras estos hablaban. Una vez cuelgan la llamada ella le pregunta a Andrés para qué lo quería Jossie. Andrés contesta que Jossie andaba con Zuleyka y los habían invitado a compartir un rato para que las esposas se conocieran.[87] Que Andrés le dice a la testigo que vaya ella a casa de la mamá de Andrés a recoger una ropa y a buscar el aro, lo cual ella hace.[88] La casa de la mamá de Andrés estaba a 5 minutos en vehículo de la que compartían Andrés y la testigo. Al regresar, ya Andrés se estaba preparando y ella se prepara y se arregla también. Salieron de la casa a las 4:35 pm, lo cual recuerda porque su abuela la llamó al celular.[89]

---

[84] *Íd.*, pág. 7.
[85] *Íd.*, págs. 7-9.
[86] *Íd.*, págs. 9-11.
[87] *Íd.*, págs. 12-14.
[88] *Íd.*, pág. 14.
[89] *Íd.*, págs. 16-18.

Salieron en una Mitsubishi Nativa color rojo de cuatro puertas, año 1999, registrada a nombre del papá de Andrés.[90] Explicó que fueron a encontrarse con Jossie y su esposa por un camino que no conocía muy bien porque ella no era de Ponce y llevaba viviendo en esa residencia solo un mes. Que les tomó aproximadamente 40 minutos subiendo por curvas y cuestas.[91] Llegaron a un lugar que luego supo que se llamaba Las Cabañas. Que en el lugar solo estaban Jossie y Zuleyka, y los dueños del negocio. Que, tras saludarse, Jossie y Andrés van a comprar cervezas y un trago para Zuleyka, mientras ellas se quedaron conversando. Luego, Andrés y Jossie jugaron billar.[92] Que estuvieron allí menos de una hora, y que Andrés y Jossie decidieron bajar a Ponce por la ruta que tomaron hasta llegar a la Carretera Núm. 10.[93] Del negocio Las Cabañas salieron en dos vehículos: Zuleyka y Jossie iban en un Honda Civic, color violeta que conducía Jossie; y la testigo y Andrés, iban en su Mitsubishi Nativa que conducía Andrés. A los 15 minutos se detuvieron en otro negocio que quedaba en un cruce, donde los hombres se tomaron otras cervezas, Zuleyka otro trago, y ellos jugaron otras dos rondas de billar. Que en ese negocio había alrededor de 10 personas y estuvieron allí menos de una hora.[94] Entonces, volvieron a salir y fueron de camino a Ponce. Nuevamente se detuvieron en un negocio, se bajaron los cuatro y entraron, pero no compraron bebidas. Andrés fue al baño y se fueron en ruta a la Carretera Núm. 10.[95] Relató que Andrés le dijo que antes de despedirse de Zuleyka y Jossie irían al Colmado Pérez, se darían

---

[90] *Íd.*, pág. 18.
[91] *Íd.*, págs. 19-20.
[92] *Íd.*, págs. 20-21.
[93] *Íd.*, pág. 22.
[94] *Íd.*, págs. 23-25.
[95] *Íd.*, págs. 25-26.

unas cervezas y se irían.[96] La Sra. Meléndez explicó que habían estado allí cuando compraron la guagua Nativa roja. Llegaron al Colmado Pérez y se estacionaron, la testigo y Andrés justo frente al lugar, Jossie y Zuleyka al otro lado de la carretera, un poco más al frente de la guagua Nativa.[97] Los cuatro entraron al negocio y se dirigieron a la mesa de billar, que estaba al fondo a la izquierda.[98] Relató que había unos señores jugando en una mesa de dominó justo en la entrada del lugar por el lado izquierdo, antes de la mesa de billar. Nadie jugaba en la mesa de billar y había entre 13 y 14 personas en el Colmado.[99] Tan pronto entraron al Colmado, Zuleyka y la testigo se quedaron al lado de la mesa de billar, y Andrés y Jossie fueron a comprar cervezas y el trago para Zuleyka. Luego, Andrés y Jossie comenzaron a jugar billar, Zuleyka y la testigo estaban hablando al lado de ellos, mientras ellos jugaban y bailaban.[100] La Sra. Meléndez declaró que Andrés y Jossie terminaron de jugar billar y que Zuleyka y la testigo iban a jugar billar antes de irse del Colmado. Mencionó que: "Cuando iba, yo iba a darle el, iba a, a darle el último juego, el último tiro a, a una bola que quedaba en la, en la mesa de billar."[101] Al instante, surgió el siguiente intercambio:

> **P:** ¿Qué pasó? Antes de que le dé el último tiro a la mesa. Mientras usted estaba en el local, en ese local, ¿qué fue lo que le llamó la atención en, en ese local a usted?
>
> **Lcdo. José R. Santiago Pereles:** Juez, tengo objeción.
>
> **Juez:** ¿Cuál es la objeción?
>
> **Lcdo. José R. Santiago Pereles:** Ella no ha dicho nada que le haya llamado la atención. Es sugestiva.

---

[96] *Íd.*, pág. 27.
[97] *Íd.*, págs. 27-29.
[98] *Íd.*, págs. 30-31.
[99] *Íd.*, pág. 32.
[100] *Íd.*, págs. 34-35.
[101] *Íd.*, pág. 35.

> **Fiscal Ada Torres:** No.
>
> **Juez:** La pregunta se le… Eh, cuando él iba a hacer el último tiro en la mesa.
>
> **Fiscal Ada Torres:** No, no.
>
> **Lcdo. José R. Santiago Pereles:** Cuando…
>
> **Fiscal Ada Torres:** An…, antes, Honorable. Le estamos haciendo, le estamos regresando nuevamente la mente a ella.
>
> **Lcdo. José R. Santiago Pereles:** De qué le llamó la atención allí.
>
> **Fiscal Ada Torres:** Al, al lugar
>
> **Juez:** Puede.
>
> **Fiscal Ada Torres:** Si nos permite.
>
> **Juez:** Reformúlela.[102]

Luego, la testigo relató que cuando estaba comenzando a jugar en la mesa de billar, hace un giro hacia detrás de ella para mirar a las personas que estaban en el negocio, y ve en el marco de una de las puertas de entrada a un hombre parado que los estaba observando.[103] Lo describió como una persona de pelo negro, nariz perfilada, con una camisa blanca, a quien no había visto antes. **A preguntas del Ministerio Público, identificó al Apelante en sala como la persona que vio ese día.**[104] Indicó que menos de 10 minutos, cuando termina el juego con Zuleyka mira alrededor y se percata que Andrés ya había salido del negocio. Relató que ya afuera, están ella y Andrés con el Colmado a la espalda y Zuleyka frente a Jossie, de frente al Colmado. Encuentra a Andrés con la cabeza baja, y le pregunta qué le pasa, y Zuleyka contesta "que está changuito". Que él levanta la cabeza, abre los ojos bien grandes y le grita "Miosotis", la toma por los dos brazos y la lanza, tirándola al suelo.[105] A preguntas del

---

[102] *Íd.*, págs. 35-36.
[103] *Íd.*, págs. 37-43.
[104] *Íd.*, págs. 43-45.
[105] *Íd.*, págs. 45-48; Tomo titulado "Revisión" de las págs. 47-54 del señalamiento de la vista del 29 de enero de 2018, págs. 48-49.

Ministerio Público, explicó que vio temor en los ojos de Andrés y que estaba mirando por encima del hombro izquierdo de ella.[106] Narró que escuchó muchas detonaciones, que cuando Andrés la tira hacia el lado de un Toyota Corolla color gris se le dobla la pierna y cuando va a caer ve a Jossie cayendo y Andrés cae encima de ella.[107] Explicó que le estaban disparando a Jossie por la espalda y que éste cayó boca arriba.[108] Indicó que no vio a Zuleyka en ese momento.[109] Que las detonaciones se seguían escuchando cuando Andrés cayó encima de ella.[110] Que intentó moverlo, lo voltea y se da cuenta que tiene sangre en las manos, sangre de Andrés que salía de la espalda de este.[111] Entonces, mira hacia Jossie y Zuleyka y empieza a gritar que llamen a la ambulancia que Andrés está vivo. Luego, nota una pausa en las detonaciones.[112] A preguntas del Ministerio Público, la testigo declaró que dejó de escuchar las detonaciones porque "**la persona que está disparando pasa por el frente del Toyota Corolla gris y va hacia donde nosotros [Andrés y la testigo] y se coloca como a 3 pies de donde yo estoy**".[113] Al llegar frente a ellos, la persona apunta y la testigo pensando que la va a matar a ella, baja la cabeza, y la persona dispara a Andrés.[114] **Tiene contacto visual con la persona que dispara. Era de nariz perfilada, pelo negro, un recorte "punk", cejas bien marcadas, "cuando te las sacas", y una mirada profunda.**[115] **Declaró que miró a la persona directamente a los ojos y que**

---

[106] Tomo titulado "Revisión" de las págs. 47-54 del señalamiento de la vista del 29 de enero de 2018, pág. 49.
[107] *Íd.*, págs. 49-51.
[108] *Íd.*, págs. 51-52.
[109] *Íd.*, pág. 53.
[110] TPO del 29 de enero de 2018, págs. 54-55.
[111] *Íd.*, págs. 55-56.
[112] *Íd.*, págs. 56-57.
[113] *Íd.*, pág. 58.
[114] *Íd.*, pág. 59.
[115] *Íd.*, págs. 59-60.

**le gritó tres veces, "A Andrés no".**[116] **Afirmó que era la misma persona que había visto antes cuando estaba dentro del Colmado y que era la misma persona sentada al lado del abogado, el Apelante, a quien identificó en corte abierta.**[117] **Añadió que le gritó que no le disparara a Andrés para que no lo matara, pero que el Apelante le disparó con una pistola con un peine largo.**[118]

Continuado el interrogatorio, la Sra. Meléndez procedió a describir el arma de fuego que portaba el Apelante cuando le dispara a Andrés ("[e]ra negra y el peine sobresalía […] de la pistola de su mano").[119] La testigo añadió que el Apelante se encontraba frente a ella con la pistola aproximadamente a 3 pies de distancia.[120] Tenía el arma en su mano derecha y la portaba con la mano extendida hacia donde estaban Andrés y la testigo.[121] A preguntas del Ministerio Público, la testigo explicó que cuando dijo que el Apelante tenía una mirada "profunda" se refería a que "[v]eía malicia en su mirada".[122] La Defensa objetó que se admitiera este testimonio, alegando que era especulativo. El Tribunal declaró con lugar la objeción.[123] Luego, la testigo declaró que vio cuando el Apelante le disparó a Andrés cuatro o cinco veces y que luego, éste se fue.[124] Ella pidió que llamaran a la ambulancia y al 911. Que cuando logró acercarse a Zuleyka pudo observar que ella estaba botando mucha sangre en sus brazos.[125] Jossie estaba en el suelo muerto frente a Zuleyka.[126] También se

---

[116] *Íd.*, págs. 60-61.
[117] *Íd.*, págs. 61-62.
[118] *Íd.*, pág. 63.
[119] TPO del 30 de enero de 2018, pág. 2.
[120] *Íd.*, pág. 11.
[121] *Íd.*, págs. 12-13.
[122] *Íd.*, pág. 13.
[123] *Íd.*, págs. 14-18.
[124] *Íd.*, págs. 20-22.
[125] *Íd.*, págs. 22-23.
[126] *Íd.*, pág. 25.

estipuló que la testigo habló con el Agente Torres Rodríguez,[127] y la Agente García Pizarro sobre cómo ocurrieron los hechos, e hizo un dibujo para ilustrarle dónde estaba ella, Andrés, Jossie y Zuleyka al momento de los hechos. El dibujo fue admitido como Exhibit 42 del Ministerio Público, sin objeción de la Defensa.[128]

Por otro lado, la testigo declaró que había iluminación al frente del Colmado y detrás de ellos; que el lugar estaba visible. Que estuvo en la escena hasta las 6:00 am del 11 de abril de 2016. También vio que los investigadores inspeccionaron varios vehículos, incluyendo la Mitsubishi Nativa de Andrés, para lo cual ella dio autorización.[129] Dentro del vehículo estaban las carteras de ella y de Andrés, la ropa que recogió en la casa de los padres de Andrés y el aro del "banchi" en el baúl.[130] En horas de la tarde del 11 de abril de 2016, el Agente Ortiz Vargas y las Agentes Rosado Rodríguez y García Pizarro fueron a la casa de los padres de Andrés para entrevistarla.[131] Durante la entrevista, describió nuevamente al Apelante. Indicó que este tenía una mirada profunda y que lo podía reconocer si lo veía.[132]

El 13 de abril de 2016, mientras estaba en la funeraria, recibió una llamada del Agente Ortiz Vargas para decirle que necesitaba llevarla a la Comandancia. Los Agentes Ortiz Vargas y García Pizarro pasaron a recogerla y le dijeron que se realizaría un "line up" y le explicaron en qué consistía el procedimiento.[133] Al llegar a la Comandancia, fue atendida por los tres agentes (Rebeca Rosado Rodríguez, Angélica García Pizarro, Noel Ortiz

---

[127] *Íd.*, pág. 29.
[128] *Íd.*, págs. 41-45.
[129] *Íd.*, págs. 58-59.
[130] *Íd.*, pág. 60.
[131] *Íd.*, págs. 62-63.
[132] *Íd.*, págs. 65-66.
[133] *Íd.*, págs. 66-69.

Vargas) y uno calvito uniformado, cuyo nombre no recordó.[134] Luego que los agentes repasaron con ella las instrucciones para la rueda de confrontación, corrieron la cortina y Miosotis identificó a la persona con el número 5 y dijo que el Apelante, a quién volvió a identificar en corte abierta, **era la misma persona que vio disparar y matar a Jossie, Andrés e hirió a Zuleyka. Antes de identificar al número 5, Miosotis se arrodilló para estar en la misma posición que el día de los hechos; cuando observó al apelante y tuvo contacto visual con él**.[135] Por último, Miosotis reconoció que las fotografías del Apelante en la rueda de confrontación (Exhibits 43 y 44 del Ministerio Público) reflejaban lo mismo que vio detrás del cristal cuando se corrió la cortina.[136]

En el contrainterrogatorio, Miosotis respondió que, al 10 de abril de 2016, no tenía Facebook porque se le había perdido un teléfono que tenía y con él la contraseña para acceder a la aplicación. Activó la cuenta de Facebook aproximadamente un mes y medio a dos meses antes de la vista del juicio (31 de enero de 2018), bajo el nombre "Mio".[137] Tiene una foto de perfil con una camisa con florecitas.[138] Luego, la Defensa le mostró una imagen y Miostis dijo que esa no era su cuenta en Facebook y que las personas que están ahí no son familiares de ella.[139]

Continuado el contrainterrogatorio, la Defensa interrogó a la Sra. Meléndez sobre la entrevista que le hizo la Agente Angélica García el día de los hechos. Con relación a dicha entrevista, la Defensa manifestó que de las notas de la agente surge que la

---

[134] *Íd.*, pág. 78.
[135] *Íd.*, págs. 78-81.
[136] *Íd.*, págs. 81-82.
[137] TPO del 31 de enero de 2018, págs. 11-12.
[138] *Íd.*, pág. 25.
[139] *Íd.*, págs. 40-41.

testigo indicó: "No. Mi teléfono no cogía señal. Yo gritaba que llamara a la ambulancia. Andrés respiraba y decía mi nombre. La gente vio quién fue. El que disparó entró al negocio y entró como si conociera. Yo pienso que eso fue para Jossie y como Andrés lo conocía lo mató. La persona se veía bien. No desorientada ni nada, ni nada. Estaba bien consciente".[140] Luego, la Defensa interrogó a la testigo sobre lo que indicó a la agente en la entrevista:

> **Lcdo. José R. Santiago Pereles:** ¿Por qué usted dice…? ¿Por qué usted dice que, que lo conocían allí?
>
> **Sra. Miosotis Meléndez Mercado:** Yo nunca dije que él. Yo nunca dije, le respondí que no a su pregunta cuando usted me pregunta. Si yo dije que a él lo saludaron allí. Yo nunca dije eso.
>
> **P:** Vamos a ir por partes. En esta, en esta contestación usted dice que aceptó que lo dije, "Yo, yo pienso que eso fue para Jossie y como Andrés lo conocía lo mató una persona que se, se veía bien. No estaba desorientada ni nada". Antes de eso, "El que disparó entró al negocio y entró como si conociera".
>
> **R:** ¿Tú…? ¿Usted me puede hablar más pausado, más claramente?
>
> **P:** Sí.
>
> **R:** Porque…
>
> **P:** Vamos.
>
> **R:** No…
>
> **P:** Vamos a eso. "El que disparó entró al negocio".
>
> **R:** Sí.
>
> **P:** Okay. "Y entró como si conociera".
>
> **R:** Entró, salió. No sé si conocía.
>
> **P:** Pues, eso fue lo que usted dijo aquí. ¿Cuál es la verdad?
>
> **R:** La verdad es que entró al negocio.
>
> **P:** Jum.

---

[140] *Íd*., págs. 73-88.

**R:** De que yo lo observé.

**P:** Ujum.

**R:** Y de que era la misma persona cuando yo estaba afuera cuando le disparó a mi esposo.

**P:** ¿Y a qué usted se refiere?

**R:** Le disparó a Jossie.

**P:** ¿Cuándo dice eso "entró como si conociera"? ¿Qué?

**R:** Tú entras. Cuando tú entras a un lugar y…, entras como si nada y sales como si nada. O sea, eso es un colmado.

**P:** ¿Eso fue lo que usted quiso decir?

**R:** Eso, eso es un colmado que se ve súper. Eso allí es familiar. Señores mayores que juegan dominó. Es un lugar que se ve como familiar. Un barrio pequeño.[141]

Por otro lado, explicó que la llamada que hizo a los familiares de Andrés fue en momentos que la policía estaba inspeccionando la Mitsubishi Nativa y la dejan ir a la guagua. Cogió el celular que estaba sobre el "dash" de la guagua e hizo una llamada a su abuela porque ya se había difundido en las noticias lo sucedido y se indicaba que ella resultó herida en los hechos. Luego, indicó que lo recuperó entre las 3:00 y 4:00 am e hizo una llamada a su padre. Sin embargo, negó que usara el celular para hacer más llamadas mientras la escena estaba en proceso.[142]

Por su parte, la Defensa intentó impugnar la credibilidad de la testigo con prueba de que esta había tenido comunicación con un amigo llamado Wilfredo Rivera Marrero, conocido por "Chino", quien a la fecha del juicio estaba acusado de un doble asesinato. La testigo negó que hubiera hablado con "Chino" sobre los hechos del caso. A preguntas de la Defensa, también negó que hubiera

---

[141] *Íd.*, págs. 90-92.
[142] *Íd.*, págs. 141-146.

enviado a "Chino" mensajes de textos por la aplicación "Messenger" para venderle un arma de fuego y el "banchi", decirle que recibió el pago de un seguro luego de la muerte de Andrés o para enviarle una foto de una sortija.[143] Indicó que, por los hechos, perdió sus cosas y hasta sus hijos y que "no tiene sortija". Negó que le hubiese enviado una foto en la que se ve dinero encima de su pierna, una foto portando un arma de fuego o que le comentó sobre los hechos.[144] Tampoco discutió con Andrés justo ante de los hechos.[145]

Expresó, además, que al salir del Colmado a buscar a Andrés, vio una Toyota Tacoma, pero no sabía la tablilla de esta y desconocía si el dueño del vehículo era el Sr. Heriberto Mass Guzmán. Declaró que ni ella ni Andrés lo conocían, y que éste tuviese una guerra por el trasiego de drogas en el residencial el Coto. Negó también que Andrés era narcotraficante y reiteró que él era camionero.[146] A raíz de esa respuesta, se admitió una Copia Certificada de un documento del Sistema DAVID, sobre un vehículo Toyota Tacoma año 2011 gris, tablilla 886048 (Exhibit 1 de la Defensa).[147]

Posteriormente, con la oposición del Ministerio Público bajo el fundamento de que la Defensa no había sentado las bases, el Tribunal autorizó traer prueba sobre una acusación previa de la testigo por apropiación ilegal para impugnar su credibilidad. La testigo aceptó que se declaró culpable por dicho delito y que pagó una multa de $100. Aclaró que solicitó la eliminación de antecedentes penales para obtener su licencia de enfermera.[148]

---

[143] *Íd.*, págs. 227-259.
[144] *Íd.*, págs. 253-260.
[145] *Íd.*, pág. 261.
[146] *Íd.*, págs. 267-268 y 271-272.
[147] *Íd.*, págs. 276-277.
[148] *Íd.*, págs. 279-294.

**8.     Sra. Zuleyka Rodríguez Colón** (Sra. Rodríguez o Zuleyka) (Vistas del 2 de mayo, 5 y 7 de junio y 2 de julio de 2018)

La Sra. Rodríguez era ama de casa para la fecha de su testimonio. Para la fecha de los hechos llevaba 10 años en una relación consensual con Jossie.[149] Declaró que Jossie estaba desempleado, pero recortaba (no especificó que).[150] Expresó que Andrés y Jossie eran amigos. La testigo conocía a Andrés desde que estaba en la escuela superior Juan Serralles en Coto Laurel. Indicó que para la fecha de los hechos ella no sabía a qué se dedicaba Andrés.[151] Conoció a Miosotis y la vio dos veces: la primera vez, dos meses antes de que ocurrieran los hechos, cuando Andrés la llevó a su casa y el día de los hechos.[152] Narró que el 10 de abril de 2016, aproximadamente a las 3:00 pm salió de su casa con Jossie en un Honda Civic, color violeta, tablilla HNI 936 de ella, en dirección al sector Coto Laurel, Ponce.[153] Jossie era quien conducía el vehículo. Explicó que antes de llegar a Coto Laurel pararon en el negocio Casita de Campo ubicado en el sector Real Anón. Que en ese negocio, Jossie se bajó a comprar una cerveza y un trago para la testigo pero ella se quedó en el vehículo. Luego, siguieron en dirección a Coto Laurel y pararon en el garaje Gulf para echar gasolina. Continuaron su marcha en dirección a la Urbanización Las Monjitas. Subieron por la carretera hacia Mayagüez hasta llegar al restaurante Las Cabañas. En dicho negocio pidieron comida. Jossie compró una cerveza y un trago para la testigo. Declaró que en ese negocio había 4 o 5 personas.[154] Después de comer, Jossie y ella jugaron billar. De momento el teléfono comenzó a sonar y era Andrés. La

---

[149] TPO del 2 de mayo de 2018, págs. 4-5.
[150] *Íd.*, pág. 5.
[151] *Íd.*, págs. 5-6.
[152] *Íd.*, págs. 6-7.
[153] *Íd.*, pág. 7.
[154] *Íd.*, págs. 8-9.

conversación entre Andrés y Jossie duró poco. Elaboró que Jossie le dijo que "era Andrés que venía para donde nosotros estábamos".[155] Que aproximadamente 20 minutos después de la llamada llegaron Andrés y Miosotis a Las Cabañas en una Nativa roja. Andrés conducía el vehículo. Tras llegar al lugar, Andrés y Miosotis se dirigieron hacia ellos en el área de billar. Luego, Andrés y Jossie jugaron billar y pidieron cervezas y tragos.[156] Que estuvieron allí como una hora, y que se marcharon a otro negocio que queda más arriba. Del negocio Las Cabañas salieron en dos vehículos: Zuleyka y Jossie iban en el Honda y Miosotis y Andrés en la Nativa. Se bajaron los cuatro en el otro negocio y Andrés fue al baño. Jossie, Miosotis y la testigo permanecieron en el borde de una puerta mientras Andrés iba al baño.[157] No estuvieron mucho tiempo en el negocio. Andrés pidió bebidas para todos. Entonces, volvieron a salir y se dirigieron a otro negocio que quedaba como 3 minutos más arriba. Al llegar al negocio, entraron los cuatro y Andrés y Jossie se pusieron a jugar billar.[158] Zuleyka y la testigo se quedaron al lado de la barra sentadas en una silla hablando. Permanecieron allí aproximadamente media hora o una hora. Relató que, al salir de ese negocio se dirigieron a la intersección que hay entre Jayuya y Adjuntas.[159] Al llegar a la intersección, se fueron en ruta a la Carretera Núm. 10 hacia Ponce. Andrés y Zuleyka conducían al frente y Jossie y la testigo los seguían atrás en su vehículo.[160] Tardaron como 3 a 5 minutos en llegar al Colmado Pérez. La Sra. Rodríguez declaró que ella nunca había visitado ese negocio anteriormente. Llegaron al Colmado Pérez y

---

[155] *Íd.*, pág. 10.
[156] *Íd.*, págs. 11-12.
[157] *Íd.*, pág. 12.
[158] *Íd.*, pág. 13.
[159] *Íd.*, págs. 14-15.
[160] *Íd.*, pág. 18.

se estacionaron, Andrés frente al Colmado, Jossie y la testigo más al frente "como en una bajadita" a mano derecha.[161] Los cuatro entraron al Colmado y se dirigieron al área del billar, que estaba al fondo a la izquierda.[162] Relató que en el Colmado había como 20 personas. Tan pronto entraron al Colmado, Miosotis y la testigo se quedaron sentadas hablando al lado de la mesa de billar, y Andrés fue a comprar cervezas para Jossie, Zuleyka y la testigo. Luego, Andrés y Jossie jugaron billar. Al ellos terminar, Miosotis y la testigo jugaron billar como 10 o 15 minutos. Cuando estaban terminado, Andrés le dijo a Miosotis que tirara el bolo "en la boca que él dice y ella le dijo que no. Y él se fue. Él salió afuera" del negocio.[163] Esa era la última jugada. Cuando termina el juego, Jossie, Miosotis y la testigo salieron del Colmado. Andrés estaba sentado en un tronco de un árbol al otro lado de la carretera.[164]

Continuó relatando la testigo, que los tres se dirigieron hacia Andrés. Miosotis se ubicó al lado izquierdo de la testigo. Al frente estaba Andrés y Jossie estaba al lado derecho de la testigo, en la parte de atrás pegado a la testigo. Indicó que se acercó a Andrés y le dijo "que si estaba chango". Que Andrés bajó la vista y le dijo que no. Miosotis le dijo algo a Andrés, pero no escuchó lo que ella le dijo.[165] A preguntas del Ministerio Público explicó que, en ese momento escuchó un ruido y sintió que le dieron en la mano izquierda desde atrás. Al mirar su mano vio que estaba llena de sangre. Narró que sintió que Jossie chocó con su espalda. Que cuando miró hacia atrás, a su lado derecho, vio que Jossie estaba tirado en el piso boca arriba. Indicó que, en ese momento, Jossie

---

[161] *Íd.*, pág. 19.
[162] *Íd.*, págs. 19-22.
[163] *Íd.*, págs. 23-26.
[164] *Íd.*, pág. 26; TPO del 5 de junio de 2018, pág. 3.
[165] TPO del 5 de junio de 2018, pág. 4.

estaba muerto porque le gritó y nunca contestó.[166] Explicó que escuchó muchas detonaciones detrás de ella, desde el área de la carretera y que no vio a Miosotis en ese momento. Entonces, la testigo se "enñangotó" y se aguantó la mano porque tenía mucha sangre. Sintió que una persona venía detrás de ella, como si fuera a rematarla. La testigo miró al lado izquierdo. Ahí estaba Andrés boca abajo tirando en una gravilla. Vio que la persona se acercó a Andrés. La testigo volteó la cara hacia el lado derecho porque pensó que si miraba a la persona él la iba a matar. Solo pudo ver que la persona tenía unas chancletas negras estilo Nike o Jordan con un pantalón corto negro. No logró ver más, pero piensa que la persona llevaba una camisa blanca por encima del pantalón.[167] Escuchó los gritos de Miosotis y las puertas del negocio cerrándose. Luego, escuchó un silencio y empezó a gritar que llamaran al 911 porque Andrés estaba respirando.[168] Indicó que ella estaba mareada y llena de sangre. Sacó su celular de la parte de atrás de su bolsillo para llamar al 911 y se percata que estaba herida en su brazo derecho. Tenía una herida de bala en la mano derecha y dos en la mano izquierda.[169] Escuchó a lo lejos las ambulancias. Llegaron los paramédicos a su lado y la llevaron al Hospital San Lucas de Ponce.[170] Luego fue trasladada a Centro Médico para ser atendida. A preguntas del Ministerio Público, indicó que vio a una persona disparando el día de los hechos.[171] Luego, declaró que su celular se quedó en la escena, donde ella estaba cuando llegaron los paramédicos.[172] Después que le dieron el alta en el hospital, tuvo que comparecer a la Comandancia en

---

[166] *Íd.*, págs. 5-7.
[167] *Íd.*, págs. 8-12.
[168] *Íd.*, págs. 14-15.
[169] *Íd.*, págs. 15-19.
[170] *Íd.*, págs. 21-24.
[171] *Íd.*, pág. 24.
[172] *Íd.*, pág. 28.

Ponce, donde fue entrevistada por la Agente Rebecca Rosado y un agente trigueño, de quién dijo no recordar su nombre.[173]

Continuado el interrogatorio, la Sra. Rodríguez procedió a describir la vestimenta de Jossie. Declaró que éste tenía una camisa color negro, mahón azul, tenis Jordan color negro, gris y verde menta, y un gorra color negro, verde menta y gris. Con relación al celular, explicó que Jossie también tenía un celular como el de ella, color negro marca ZTE, y que ambos celulares estaban a nombre de la testigo. Jossie tenía el celular en el lado derecho de su bolsillo.[174] Luego, la Sra. Rodríguez procedió a describir el arma de fuego que portaba la persona que le disparó a Andrés. El arma era negra y la portaba en su mano derecha.[175] Además, se estipuló y se vertió para el récord la regrabación de la llamada que hizo la testigo al Sistema 911 (Exhibit 5).[176]

En el contrainterrogatorio, la Sra. Rodríguez ratificó que en su declaración jurada del 14 de abril de 2016, dijo: "Ahí me percaté que había un muchacho trigueño claro, joven, no muy alto ni muy bajito que tenía una T-shirt gris parado en el borde [de] la puerta del negocio y nos miraba".[177] Luego, surgió el siguiente intercambio:

> **Juez:** En la declaración jurada que ella dice que en la puerta ve a una persona ya ella mencionó que sí. Y ahí le va a hacer la pregunta el licenciado.
>
> **Lcdo. José R. Santiago Pereles:** Mire bien, mire bien a ese muchacho que está ahí, mire bien. Le pregunto yo a usted categóricamente, lo cierto es que ese muchacho que usted vio no es ése.
>
> **Sra. Zuleyka Rodríguez Colón:** No.
>
> [...]

---

[173] *Íd.*, pág. 40.
[174] *Íd.*, págs. 44-45; TPO del 7 de junio de 2018, págs. 7-8.
[175] TPO del 7 de junio de 2018, pág. 6.
[176] *Íd.*, págs. 19-29.
[177] TPO del 2 de julio de 2018, págs. 54-55.

> **P:** No es. ¿verdad que no? Ni se parece a ese muchacho que usted vio.
>
> **R:** No.[178]

Afirmó, a preguntas de la Defensa, que el Apelante no era la misma persona que vio disparando. Que solo vio a la persona de la cintura hacia abajo.[179] La testigo añadió que la persona tenía el arma en la mano derecha "para abajo".[180] Indicó que no vio a Miosotis en ese momento. Que vio a Miosotis después que sucedió todo, y que ella salió gritando "de atrás, de donde estaba Andrés".[181] A preguntas de la Defensa, la testigo declaró que ella nunca dijo que sabía quién mató a su esposo.[182] Luego, la testigo declaró que no podía decir que el Apelante mató a su esposo porque ella no le vio la cara.[183]

En el redirecto, la Sra. Rodríguez aclaró que la vestimenta de la persona que vio en la puerta del Colmado y la persona que disparó a Andrés era diferente.[184] Que había otras personas que se pararon en la puerta del Colmado.[185] Que cuando ella cayó al área del cemento no miró a la persona que le estaba disparando a Andrés porque sintió temor de que fuera a matarla.[186] Que escuchó a Miosotis gritando cuando se calmó todo y no se escucharon más detonaciones. Los gritos provenían del área donde estaba Andrés. La testigo no vio a Miosotis en ese momento porque estaba mareada, pero sentía que estaba cerca de ella.[187]

**9. Agente Angélica García Pizarro** (Agente García Pizarro) (Vistas del 30 y 31 de julio de 2018)

---

[178] *Íd.*, pág. 58.
[179] *Íd.*, págs. 74-77.
[180] *Íd.*, págs. 77-78.
[181] *Íd.*, págs. 80-81.
[182] *Íd.*, págs. 81 y 84.
[183] *Íd.*, págs. 109-111.
[184] *Íd.*, pág. 112.
[185] *Íd.*, págs. 112-113.
[186] *Íd.*, págs. 113-115.
[187] *Íd.*, págs. 119-120.

La Agente García Pizarro trabaja en la División de Homicidios en Ponce desde el 2012, ejerciendo funciones de Agente Investigador. Su capacidad quedó estipulada.[188] La testigo declaró que el 10 de abril de 2016 no estaba trabajando. Estaba en su casa y aproximadamente a las 10:00 pm, recibió una llamada del Supervisor de la División de Homicidios en aquel momento, el Agente Noel Ortiz Vargas, para que se incorporara a trabajar y colaborar en la investigación de un asesinato que había ocurrido en Ponce.[189] La Agente García Pizarro llegó a la Comandancia en Ponce y de ahí el Agente Ortiz Vargas y la Agente Rosado Rodríguez la transportaron a la escena.[190] Al llegar a la escena, vio que estaba acordonada y había un perímetro establecido para que las personas no pasaran al área donde estaban ubicados los occisos, frente al Colmado Pérez.[191] Un occiso estaba tirado en el suelo frente a un vehículo Tacoma color gris. El otro occiso estaba al lado de un vehículo Toyota Corolla color gris y sobre una gravilla.[192] Ambos estaban en el suelo boca arriba.[193] La Agente García Pizarro declaró que el Agente Ortiz Vargas le instruyó que entrevistara a la Sra. Meléndez.[194] Esta se encontraba dentro del perímetro establecido en la escena. Estaba llorando y caminando de lado a lado y un agente estaba tratando de dirigirla para que saliera del perímetro.[195]

Entrevistó a la Sra. Meléndez en la escena porque ella no quería irse del lugar.[196] Indicó que, la Sra. Meléndez le narró lo que había sucedido en el Colmado Pérez el día de los hechos.

---

[188] TPO del 30 de julio de 2018, págs. 3-4.
[189] *Íd.*, págs. 2-3.
[190] *Íd.*, pág. 7.
[191] *Íd.*, pág. 8.
[192] *Íd.*, pág. 9.
[193] *Íd.*, pág. 10.
[194] *Íd.*
[195] *Íd.*, págs. 11-12.
[196] *Íd.*, págs. 14-15.

También le dibujó en un papel como estaban ubicados los cuatro, refiriéndose a Andrés, Jossie, Zuleyka y Miosotis, en el Colmado.[197] Según la testigo, la Sra. Meléndez le narró que cuando los cuatro estaban afuera del Colmado escuchó el sonido de una puerta de un vehículo y luego, escuchó muchas detonaciones. Que ella vio cuando el Apelante le disparó a Jossie. Que en ese momento Andrés la agarró y la tiró al suelo en el área donde está la gravilla, al lado del conductor del vehículo Toyota Corolla color gris. La Sra. Meléndez estaba mirando al Apelante y le dijo: "Por favor, a Andrés no".[198] Que el Apelante les hizo varios disparos y un disparo le rozó una uña a Miosotis.[199] La Sra. Meléndez describió a la persona que disparó como blanquito, bajito, perfilado, con pelo negro y un "punk".[200] Dijo que no conocía a la persona que había disparado, pero sí lo había visto, ese mismo día, dentro del Colmado Pérez cuando ella estaba jugando billar.[201] La Sra. Meléndez procedió a describir el arma de fuego que portaba el Apelante cuando le disparó a Andrés. Era un arma de fuego negra y tenía el peine largo.[202] La Sra. Meléndez le dijo que fue una sola persona que disparó. La misma persona que ella vio disparándole a Jossie fue la misma persona que se acercó a ellos y le disparó a Andrés. La persona que le disparó a Andrés y a Jossie era la misma persona que había entrado al Colmado.[203] La Agente García Pizarro indicó que la Sra. Meléndez fue bien precisa y segura en sus respuestas, a pesar de estar llorando.[204] Luego, la Defensa objetó varias de las preguntas del interrogatorio

---

[197] Íd., págs. 18-21 y 32.
[198] Íd., págs. 21-24.
[199] Íd., págs. 24 y 26.
[200] Íd., pág. 27.
[201] Íd., pág. 28.
[202] Íd., pág. 30.
[203] Íd., págs. 30, 36 y 58.
[204] Íd., pág. 39.

por, entre otras, ser repetitivas y sugestivas. El Tribunal declaró ha lugar las objeciones.[205] Por otra parte, la Sra. Meléndez también le expresó que no llamó al 911 porque no tenía señal.[206]

Luego que terminó la entrevista, la Agente García Pizarro expidió una citación para que la Sra. Meléndez fuera a la Comandancia el 11 de abril de 2016, a la 1:00 pm. La Sra. Meléndez no llegó a la cita, por lo que los Agentes García Pizarro, Ortiz Vargas y Rosado Rodríguez fueron a la casa de los padres de Andrés, donde encontraron a la Sra. Meléndez, quien todavía estaba impactada por lo ocurrido. Vio cuando la Agente Rosado Rodríguez entrevistó a la Sra. Meléndez, quien volvió a narrar lo ocurrido, incluyendo la misma descripción de la persona que disparó a Jossie, Andrés, Zuleyka y a ella, y que esta fue la única que disparó.[207]

En cuanto a la rueda de confrontación, declaró que el 13 de abril de 2016, ella junto al Agente Ortiz Vargas, recogieron a la Sra. Meléndez en la funeraria y la llevaron a la Comandancia. Antes que iniciara la rueda de confrontación, el Agente Nieves Ortiz le explicó el procedimiento a la Sra. Meléndez. Al correr la cortina, tras la cual estaban los participantes de la rueda, la Sra. Meléndez observó a los participantes y pidió ponerse en la misma posición que estaba cuando ocurrieron los hechos. Al ponerse de rodillas en el suelo, subió la cabeza e identificó al número 5, comenzó a llorar y dijo: "Es él. Es el cinco. No puedo olvidar esa mirada". La Agente García Pizarro identificó al Apelante en corte abierta e indicó que era la persona que tenía el número 5 y quien la Sra. Meléndez identificó en la rueda de confrontación.[208]

---

[205] *Íd.*, págs. 48-53.
[206] *Íd.*, pág. 57.
[207] *Íd.*, págs. 58-66.
[208] *Íd.*, págs. 68-72.

En el contrainterrogatorio, explicó que durante la rueda de confrontación se mantuvo en la puerta del cuarto, a dos pies de distancia de la Sra. Meléndez, que no pudo ver detenidamente a las cinco personas que eran parte de la rueda de confrontación porque no se paró frente al cristal.[209] Indicó que la Agente Rosado Rodríguez estuvo a cargo de la rueda de confrontación y negó que hubiese maquillado al Apelante.[210] Expresó que la Sra. Meléndez se tomó su tiempo para identificar al Apelante pero desconocía cuánto tiempo se tomó para hacerlo.[211] Por último, la Defensa le mostró a la testigo la foto de fichaje del Apelante (Exhibit 2 de la Defensa). Esta indicó que reconocía el documento y tenía la foto del Apelante.[212] A preguntas de la Defensa, declaró que la foto se diferencia a la que sale en la rueda de confrontación (Exhibit 43 del Ministerio Público) porque en la primera, el Apelante tiene un "goatee" y en la segunda, "[s]e le ve algo" y "[t]iene algo". La Defensa le pregunto si el Apelante tiene maquillaje y ella respondió "[n]o sé lo que es".[213]

**10.   Agente Pablo Vélez Blay** (Agente Vélez Blay) (Vistas del 1 de agosto y 9 de octubre de 2018)

El Agente Vélez Blay declaró que llevaba aproximadamente 14 años en la División de Inteligencia Criminal y Crimen Organizado (CICC) de Ponce.[214] El 11 de abril de 2016, el testigo trabajó el turno regular de 9:00 am a 7:00 pm. Aproximadamente a las 9:00 am estaba en su oficina y recibió una llamada de una persona con voz masculina, quien no se identificó y le dijo que tenía información sobre los asesinatos en el Colmado Pérez.[215] Esa

---

[209] TPO del 31 de julio de 2018, págs. 38-40.
[210] *Íd.*, pág. 42.
[211] *Íd.*, págs. 49-51.
[212] *Íd.*, págs. 54-59.
[213] *Íd.*, págs. 57-59.
[214] TPO del 1 de agosto de 2018, págs. 3-4.
[215] *Íd.*, págs. 6 y 12.

información la plasmó en una Hoja de Confidencias para tener constancia de la información recibida y luego en la Hoja de Labor Diaria.[216]

Luego, buscó información sobre la persona objeto de la confidencia en el sistema de Obras Públicas, RCI y las redes sociales. Al verificar Facebook, halló dos cuentas a nombre del Apelante que incluían fotografías que coincidían con las descripciones que recibió en la confidencia. Sustrajo copia de las fotos para continuar con la investigación y verificar la confidencia. Identificó en corte abierta al Apelante, como la persona a quien pertenecían las dos cuentas en Facebook que halló como resultado de la investigación. Las fotos extraídas de la cuenta de Facebook fueron admitidas como Exhibits 66 y 67 del Ministerio Público, sin oposición de la defensa. Además, se admitió la hoja de información sobre el Apelante extraída de RCI (Exhibit 68). Los resultados de la investigación se los rindió al Agente Ortiz Vargas.[217]

**11. Sr. José Luis Pérez González** (Sr. Pérez González) (Vista del 2 de agosto de 2018)

El Sr. Pérez González tenía 74 años, para la fecha de su testimonio, y por 42 años fue comerciante y dueño del Colmado Pérez. Declaró que residía en los altos del Colmado y que, para la fecha de los hechos, su hijo José Luis Pérez Rodríguez (José Luis) llevaba alrededor de dos años como dueño y administrador del colmado.[218] El 10 de abril de 2016, en horas de la tarde, estaba en el Colmado Pérez. Su hijo José Luis llegó como a las 4:00 pm al negocio y el testigo subió a su residencia a las 5:00 pm.[219] Luego, en horas de la noche, mientras el testigo veía televisión

---

[216] *Íd.*, págs. 9 y 14.
[217] *Íd.*, págs. 29-56
[218] TPO del 2 de agosto de 2018, págs. 9-11.
[219] *Íd.*, págs. 12-14.

solo en su residencia escuchó tres detonaciones corridas de un arma de fuego, que eran como ráfagas.[220] Las detonaciones se escuchaban al frente del Colmado, al cruzar la calle, y duraron aproximadamente 3 a 5 segundos.[221] Después que escuchó las detonaciones, esperó unos segundos, abrió la puerta de su residencia y miró para el frente de la calle. En ese momento, observó un cuerpo tirado boca arriba al cruzar la calle y una dama gritando histérica.[222] La dama gritaba "Déme un celular, un celular, que lo mataron, lo mataron".[223] El testigo describió a la dama como blanca y un poquito gordita. Explicó que, al ver la situación, decidió bajar porque su hijo, esposa y clientes se encontraban dentro del Colmado. Al bajar, se dio cuenta que el negocio había cerrado las puertas. El testigo siguió hasta el medio de la calle y miró el cuerpo que estaba boca arriba con la cabeza hacia la calle y los pies hacia la cuneta.[224] Describió el cuerpo como un muchacho joven con pelo corto.[225] Luego, vio a otra dama que caminaba en dirección al cuerpo que el vio en la escena. La dama se "enñangotó" como en posición fetal cerca de los pies del cuerpo que estaba tirado en el piso.[226] La dama era un poquito alta y delgada.[227] Al observar la situación, tocó la puerta del Colmado y se identificó. Su hijo le abrió la puerta y él entró al negocio.[228]

Luego, a preguntas del Ministerio Público, el testigo declaró que al frente del Colmado había dos vehículos: una Toyota Tacoma gris que le pertenecía a "Heri" y un Toyota gris que le

---

[220] *Íd.*, págs. 14-15.
[221] *Íd.*, pág. 16.
[222] *Íd.*, págs. 17-19.
[223] *Íd.*, pág. 19.
[224] *Íd.*, págs. 20-22.
[225] *Íd.*, pág. 22.
[226] *Íd.*, pág. 23.
[227] *Íd.*, pág. 24.
[228] *Íd.*, pág. 25.

pertenecía a "Cheo". Éstos eran clientes y estaban dentro del Colmado.[229] Indicó que las personas dentro del Colmado estaban alteradas y que José Luis fue quién llamó al 911.[230] Luego, se fue para su casa, pasaron unos minutos y de momento vio por el balcón que se estaba estacionando una ambulancia y una patrulla de la policía. Los paramédicos fueron hacia la dama que estaba "enñagotada", la pusieron en una camilla y se la llevaron en ambulancia.[231] Poco tiempo después, bajó y regresó al Colmado. Para ese momento la policía había solicitado que se abriera el Colmado y un agente comenzó a tomar datos a todos los clientes presentes en el Colmado. Luego regresó a su casa y se quedó con su esposa.[232]

En el contrainterrogatorio, el Sr. Pérez González declaró que llego a estar como a 3 o 4 pies de distancia del cuerpo que estaba en el suelo.[233] Que no sabía que el apellido de "Heri" era Mass pero sí lo conocía y estaba seguro que la Toyota Tacoma era de él.[234] A preguntas de la Defensa, declaró que no conoce al Apelante y que nunca lo había visto.[235] Tampoco vio a alguien disparar porque él estaba dentro de su casa. No sabe si fueron una o dos personas las que dispararon en la escena. No vio al Apelante disparar.[236] Finalmente, explicó que por medio de la policía supo que había una segunda persona muerta en la escena y que ésta no se veía desde el balcón de su residencia.[237]

**12.    Sr. José Luis Pérez Rodríguez** (Sr. Pérez Rodríguez o José Luis) (Vista del 6 de agosto de 2018)

---

[229] *Íd.*, pág. 28.
[230] *Íd.*
[231] *Íd.*, págs. 29-30.
[232] *Íd.*, págs. 30-33.
[233] *Íd.*, pág. 38.
[234] *Íd.*, págs. 40-41.
[235] *Íd.*, pág. 45.
[236] *Íd.*, pág. 48.
[237] *Íd.*, pág. 52.

El Sr. Pérez Rodríguez declaró que para la fecha de los hechos era dueño del Colmado Pérez. Dicho negocio perteneció a su padre por aproximadamente 40 años.[238] Declaró que, para la fecha de los hechos, su padre el Sr. Pérez González abrió el Colmado Pérez aproximadamente a las 8:00 am. El testigo llegó al negocio como a las 4:00 pm. Al llegar había aproximadamente 10 o 12 personas en el negocio.[239] Declaró que llegó al Colmado Pérez en un vehículo Nissan Sentra color gris, año 2005. Lo estacionó frente a un vehículo Grand Cherokee, color gris, propiedad de su padre que estaba estacionado frente a la puerta del negocio. Su padre se quedó un rato en el Colmado compartiendo con la clientela y luego subió a su casa aproximadamente a las 5:00 pm.[240]

Casi en horas de la noche, vio cuando se estacionó frente al Colmado Pérez una guagua Mitsubishi Nativa, color rojo. Luego entraron dos parejas al negocio.[241] El testigo procedió a explicar cómo veía los vehículos estacionados desde el interior del Colmado. Indicó que observó la Nativa desde el interior estacionada frente a la puerta derecha del negocio. Respecto al vehículo Cherokee gris, indicó que estaba estacionado afuera del negocio a mano derecha. Ambos vehículos estaban estacionados frente del Colmado en dirección contraria. La Cherokee estaba en dirección hacia el sur y la Nativa en dirección hacia el norte.[242] El testigo declaró que no vio quienes se bajaron de la Nativa. Que luego entraron dos parejas (hombre y mujer) al Colmado. Que él asumió las parejas venían de la Nativa. Indicó que, en ese momento, él estaba detrás del "counter" atendiendo clientes y

---

[238] TPO del 6 de agosto de 2018, págs. 3-4.
[239] *Íd.*, págs. 5-6.
[240] *Íd.*, págs. 6-7.
[241] *Íd.*, pág. 8.
[242] *Íd.*, pág. 9.

que, mirando de adentro hacia afuera, las parejas entraron al Colmado por la puerta derecha. En ese momento había aproximadamente 15 o 20 personas en el Colmado.[243]

A preguntas del Ministerio Público procedió a describir a las parejas que entraron al Colmado. La primera, era un hombre de tez trigueña y la mujer era de tez blanca con pelo rubio y ojos claros. La segunda, era un hombre de tez blanca y flaco y la mujer era de pelo negro y alta.[244] Luego, el testigo precisó que las parejas se dirigieron hacia el área del billar. Que al hombre de tez trigueña la había visto por primera vez unos meses antes "de pasada" y que iba acompañado de una fémina, pero no recordaba cómo era ella.[245] Relató, además, que el día de los hechos, las parejas estuvieron compartiendo en el área del billar y decidieron marcharse del lugar entre 9:00 o 9:30 pm.[246] Primero salió el hombre de tez trigueña y luego, el hombre de tez blanca con las dos féminas.[247] Mientras el testigo le cobraba al cliente que estaba próximo a pagar escuchó muchísimas detonaciones, pero pensó que era una ristra de petardos. En ese momento, había música en el negocio. La vellonera estaba prendida. Segundos después a las detonaciones que parecían una ristra de petardos, el testigo escuchó entre cinco y seis detonaciones más pausadas. En las segundas detonaciones, que eran entre cinco a seis detonaciones, el testigo se percató que eran de un arma de fuego y se tiró al piso. Escuchó que las detonaciones provenían de la parte del frente del negocio, pero al otro lado de la carretera. Después que el testigo se tiró al piso pudo contar como una o dos detonaciones

---

[243] *Íd.*, págs. 10-11.
[244] *Íd.*, págs. 11-12.
[245] *Íd.*, págs. 12-13.
[246] *Íd.*, págs. 13-14.
[247] *Íd.*, págs. 14-15.

de arma de fuego.[248] El testigo, los clientes, su esposa y su mamá se encerraron en el baño del Colmado, que estaba diseñado para una persona. El testigo estuvo ahí como un minuto. Al parar las detonaciones, entendió que era prudente salir del baño para cerrar las puertas y proteger a los clientes que quedaban en el negocio.[249] Mientras cerraba la primera puerta, por donde entraron las dos parejas, miró hacia afuera y vio a una persona tirada boca arriba al otro lado de la carretera, entre la cuneta y la carretera, pero no pudo precisar por tener prisa en cerrar.[250] Al cerrar las puertas del Colmado, su papá bajó de su residencia desesperado porque no sabía qué estaba pasando allí adentro y tocó la puerta para que le abrieran. Al identificarse, el testigo le abrió la puerta. Usando un teléfono de línea, llamó al 911, porque no hay buena señal para los celulares dentro del Colmado. Explicó que hay que salir del Colmado para hacer una llamada desde un celular. Donde mejor hay señal para el celular es al frente del Colmado, al otro lado de la carretera. Al frente del Colmado tampoco hay señal.[251] Por otra parte, se estipuló y se vertió para el récord la regrabación de la llamada que hizo el testigo al Sistema 911 (Exhibit 12).[252]

Continuado el interrogatorio, el testigo declaró que luego que él llamó al 911 una fémina empezó a tocar la puerta del Colmado para que le abriera y le pedía que llamara al 911 y a una ambulancia. El testigo no abrió las puertas del Colmado hasta que llegó la policía.[253] La policía llegó como en 20 o 25 minutos después que le tocaron la puerta del negocio. Cuando abrió la

---

[248] *Íd.*, págs. 16-20.
[249] *Íd.*, págs. 21-24.
[250] *Íd.*, pág. 25.
[251] *Íd.*, págs. 26-28.
[252] *Íd.*, págs. 29-35.
[253] *Íd.*, págs. 38-39.

tercera puerta, que era la que usaban los empleados para entrar al Colmado, observó que la dama que estaba tocando la puerta era de tez blanca con pelo rubio.[254] Un policía fue hacia donde el testigo y le indicó que había un cuerpo al otro lado de la carretera, detrás de un vehículo.[255] En ese momento, el testigo le indicó al policía que había una muchacha al otro lado de la carretera que había movido su mano para que la atendieran los paramédicos. Le dijo esto al policía porque pensaban que la muchacha también estaba muerta. Ella estaba en posición fetal.[256]

Respecto a los vehículos, declaró que, al otro lado de la carretera, pero frente al negocio había una Tacoma y un Corolla grises. Frente a las puertas del negocio estaban las dos guaguas, la Cherokee y Nativa roja. Indicó que la Tacoma gris pertenece a un cliente habitual llamado "Heri". El Corolla gris pertenece a otro cliente habitual que se llama "Cheo". Explicó que los clientes habituales son del barrio y que van más de dos o tres veces a la semana al Colmado.[257]

En el contrainterrogatorio, declaró que conocía a "Heri" desde dos años previos a los hechos y las veces que visitaba el Colmado había ido en el mismo vehículo. No pudo precisar a qué hora llegó "Heri" ese día, ni si su vehículo fue movido después de los hechos. Expresó que "[t]odo estuvo intacto hasta que llegó la policía". Se mantuvo en el Colmado hasta que los policías se fueron y estos se llevaron los dos vehículos, Corolla y Tacoma. Entonces, cerró el Colmado y se fue a su casa.[258]

**13.   Agente Noel Ortiz Vargas** (Agente Ortiz Vargas) (Vistas del 9 y 10 de octubre de 2018)

---

[254] *Íd.*, págs. 40-41.
[255] *Íd.*, pág. 41.
[256] *Íd.*, pág. 42.
[257] *Íd.*, págs. 43-44.
[258] *Íd.*, págs. 67-69.

El Agente Ortiz Vargas, quien para la fecha de los hechos trabajaba como Supervisor de la División de Homicidios del Cuerpo de Investigación Criminal del Área de Ponce (CIC), declaró que ese día trabajó el turno diurno de 9:00 am a 5:00 pm, y posteriormente permaneció en espera de llamada ("on call") por si ocurría una escena violenta.[259] Aproximadamente a las 9:30 pm recibió una llamada a su teléfono personal del Centro de Mando de la Policía de Puerto Rico indicándole que había ocurrido un doble asesinato.[260] Luego de recibir la llamada, se comunicó con las Agentes Rosado Rodríguez y García Pizarro para que se incorporaran a trabajar.[261] El Agente Ortiz Vargas llegó a la Comandancia a reunirse con las Agentes Rosado Rodríguez y García Pizarro, y de ahí se dirigieron a investigar la escena.[262] Antes de llegar a la escena, el Agente Ortiz Vargas fue con las agentes al Hospital San Lucas en Ponce, para corroborar una información sobre una persona que había llegado herida de bala al hospital. El Agente Ortiz Vargas entrevistó a Zuleyka en la sala de emergencias del hospital, y pudo corroborar que, en efecto, ella estaba allí recibiendo asistencia médica por unas heridas de balas que recibió en la escena. El doble asesinato ocurrió frente al Colmado Pérez, Carretera 503, Sector Aguacate, Barrio Tibes, en Ponce.[263]

Refiriéndose a la escena del crimen, el Agente Ortiz Vargas declaró que al llegar había un perímetro establecido. Estaba el Agente Abiú Torres Rodríguez junto a otros compañeros que estaban custodiando la escena. Observó dos cuerpos sin vida. Uno estaba sobre la carretera y el otro a la orilla de la carretera, sobre

---

[259] TPO del 9 de octubre de 2018, págs. 32-33.
[260] *Íd.*, págs. 33-35.
[261] *Íd.*, pág. 36.
[262] *Íd.*, pág. 37.
[263] *Íd.*, págs. 37-41.

la gravilla. También observó una gran cantidad de casquillos de balas disparados y varios vehículos estacionados frente al Colmado y al otro lado de la carretera.[264] Escuchó cuando el Agente Torres Rodríguez le indicó a la Agente Rosado Rodríguez que había una persona en la escena, pareja de una de las víctimas, que había presenciado los hechos. El Agente Torres Rodríguez le instruyó que la entrevistara en el lugar de los hechos. La persona resultó ser Miosotis.[265] Respecto a los occisos, el Agente Ortiz Vargas declaró que el cuerpo sobre el pavimento estaba boca arriba, con la cabeza en dirección hacia el Colmado y los pies hacia el área de la gravilla. Era masculino y presentaba varias heridas de bala, entre ellas, en la cabeza. El cuerpo sobre la gravilla blanca también estaba boca arriba y tenía heridas de balas.[266]

Posteriormente, el Agente Ortiz Vargas declaró que, en horas de la tarde del 11 de abril de 2016, fue junto a la Agente Rosado Rodríguez a la casa de los padres del occiso Vargas Ortiz para entrevistar a Miosotis.[267] Luego, la Agente Rosado Rodríguez continuó la investigación, la que incluyó entrevistar a Zuleyka.[268] **De la entrevista a Zuleyka surgió que una misma persona la hirió y mató a los occisos Luna Guzmán y Vargas Ortiz**.[269]

Por otro lado, el testigo declaró que, el 11 de abril de 2016, el Agente Vélez Blay lo llamó para informarle sobre una confidencia recibida relacionada a los hechos de este caso. El Agente Vélez Blay también le entregó al testigo un escrito donde anotó la información que recibió en la confidencia. Además, le entregó unas páginas de Facebook sobre el Apelante y unos

---

[264] *Íd.*, págs. 41-42.
[265] *Íd.*, págs. 42-44.
[266] *Íd.*, págs. 45-46 y 48.
[267] *Íd.*, pág. 51.
[268] *Íd.*, pág. 53.
[269] *Íd.*, pág. 65.

documentos del sistema David. Con esa información, el 12 de abril de 2016, el testigo fue en horas de la tarde al Barrio Tuque, en Ponce a localizar la residencia del Apelante. El testigo fue con las Agentes Rosado Rodríguez, García Pizarro y el Teniente Sullivan. El testigo identificó al Apelante sentado frente a una residencia y éste fue citado por la Agente Rosado Rodríguez para ser sometido a una rueda de confrontación. Miosotis iba a participar en la rueda de confrontación porque ella vio a la persona que le disparó a Andrés y a Jossie.[270] Además, frente a la residencia había un vehículo Hyundai, cuatro puertas color rosa claro "Pepto Bismol", que era propiedad del Apelante. La Agente Rosado Rodríguez hizo un inventario en presencia del Apelante y ocupó el vehículo para investigación.[271] El 13 de abril de 2016, el testigo junto a la Agente García Pizarro, llevaron a Miosotis a la Comandancia en la División de Servicios Técnicos para realizar la rueda de confrontación.[272] El testigo relató el proceso llevado a cabo para la rueda de confrontación. Según éste, Miosotis solicitó que los participantes hicieran varios ejercicios en la rueda de confrontación, y al final identificó al Número 5 como la persona que disparó a Andrés, a Jossie y a Zuleyka. Además, el testigo declaró que el Número 5 era el Apelante, a quien identificó en corte abierta.[273] Por último, el Agente Ortiz Vargas declaró que el 29 de junio de 2016, entrevistó al paramédico Wilkins Quintana Fraticelli y a la paramédico Sairely Rivera Rodríguez. Ellos fueron los paramédicos que llegaron a la escena por medio de la llamada al Sistema 911.[274]

---

[270] *Íd.*, págs. 53-58, 60 y 62-63.
[271] *Íd.*, págs. 65-68.
[272] *Íd.*, págs. 68-70.
[273] *Íd.*, págs. 68-72.
[274] *Íd.*, págs. 73 y 76-79.

En el contrainterrogatorio, el Agente Ortiz Vargas declaró que cuando llegó a la residencia del Apelante, este no tuvo reparos y permitió que se ocupara su vehículo para inventario e investigación. Respecto al inventario, indicó que no se ocuparon casquillos, balas, sustancias controladas, parafernalia, armas blancas o de fuego.[275] En cuanto a la citación para que el Apelante fuera a la rueda de confrontación, indicó que se le explicó que era citado como sospechoso.[276] Luego se le mostró al Agente Ortiz Vargas el Exhibit 45 del Ministerio Público, e indicó que el documento (del 12 de abril de 2016) no dice que el Apelante era sospechoso de algún delito.[277] Expresó que cuando el Apelante recibió la citación, no informó que se negaba a participar, ni solicitó asistencia de abogado. Incluso, este compareció solo a la citación.[278] Luego, se le mostró al Agente Ortiz Vargas el Exhibit 46 del Ministerio Público, e indicó que este era el documento con las advertencias de ley que la Agente Rosado Rodríguez le hizo al Apelante el 13 de abril de 2016, a las 2:30 pm (una hora antes de la rueda de confrontación). Aclaró que no estuvo presente cuando se completó el documento. Además, indicó que tampoco se le hicieron las advertencias al Apelante cuando fue citado el día anterior.[279]

Respecto a la rueda de confrontación, declaró que esta estuvo a cargo de la Agente Rosado Rodríguez y él ayudó a conseguir a los participantes de la rueda. Desconoce quien dio instrucciones para que maquillaran al Apelante. Él no estuvo presente cuando maquillaron al Apelante. Indicó que no es

---

[275] TPO del 10 de octubre de 2018, págs. 15-19.
[276] *Íd.*, pág. 20.
[277] *Íd.*, págs. 22-23.
[278] *Íd.*, págs. 24-25.
[279] *Íd.*, págs. 25-27.

costumbre de la policía maquillar a los sospechosos.[280] La Defensa le mostró las fotografías de la rueda de confrontación (Exhibits 43 y 44 del Ministerio Público) y preguntó si el Apelante estaba maquillado. El testigo respondió que "[e]n esta foto se puede notar que tiene algo en la barba" y "[e]n el área de la barbilla".[281] Por otro lado, indicó desconocer que había un informe pericial que dice que había dos armas de fuego en la escena.[282]

En el redirecto, la Defensa estipuló que luego que se le hicieran las advertencias, el Apelante no solicitó la asistencia de abogado.[283] En cuanto a la foto de la rueda de confrontación (Exhibit 45 del Ministerio Público), el Agente Ortiz Vargas indicó que vio algo en la barbilla de los participantes número 3 y número 5.[284]

**14. Sr. Wilkins Quintana Fraticelli** (Paramédico Quintana) (Vista del 10 de octubre de 2018)

El Paramédico Quintana declaró que trabaja para el Cuerpo de Emergencias Médicas Municipal de Ponce. El 10 de abril de 2016, trabajaba en el turno de 3:00 a 11:00 pm. Que recibió una llamada del sistema 911 a las 9:20 pm y fue activado para ir al Barrio Tibes, Sector Aguacate, Carretera 503, porque aparentemente había unas víctimas heridas de armas blancas o armas de fuego.[285] Salió junto a la Paramédico Sairelyn Rivera y llegaron a la escena aproximadamente a las 9:39 pm.[286]

El testigo encontró en la escena a un hombre tirado en el pavimento sin signos vitales. Observó que el hombre tenía mucha

---

[280] *Íd.*, págs. 27-31.
[281] *Íd.*, págs. 32-33.
[282] *Íd.*, pág. 47.
[283] *Íd.*, pág. 70.
[284] *Íd.*, pág. 71.
[285] *Íd.*, págs. 85-87.
[286] *Íd.*, págs. 91-94.

sangre y varios impactos de balas.[287] Luego, procedió a examinar a una dama que se encontraba tirada en el pavimento. La mano derecha la tenía sobre el pavimento con mucha sangre y con la mano izquierda tapaba su rostro. Encontró que la dama, estaba un poco letárgica y confundida por la situación. Al examinarla, pudo notar que tenía un impacto de bala en la extremidad superior derecha, el cual le ocasionó un sangrado profuso. Además, tenía una deformidad en el dedo pulgar de la mano izquierda, una herida en el antebrazo izquierdo y una herida en la palma de la mano, a nivel lateral, de la mano izquierda.[288] El testigo identificó a la dama como Zuleyka. A la escena llegó otra ambulancia para atender a la tercera víctima que estaba en la escena. Finalmente, el testigo indicó que terminó la escena a las 9:52 pm y que Zuleyka fue transportada al Hospital San Lucas. Esta fue recibida por el Dr. Cintrón Roura a las 10:11 pm.[289]

**15.   Dr. Luis M. Cintrón Roura** (Dr. Cintrón Roura) (Vista del 11 de octubre de 2018)

El Dr. Cintrón Roura es emergenciólogo en el Hospital San Lucas y, para la fecha de los hechos, atendió a Zuleyka en el área de trauma de la sala de emergencias. Su testimonio fue estipulado por la Defensa. El Dr. Cintrón Roura testificó sobre las heridas de balas que presentaba la Sra. Rodríguez en ambos brazos.[290] Refiriéndose al Exhibit 1 por Estipulación (Récord Médico de Zuleyka) testificó que "es una fémina de 27 años de edad. Que es traída por los paramédicos. […] hace aproximadamente una hora con heridas de bala en circunstancias desconocidas: […] que la paciente refiere que fue herida en los brazos. […] llega con dolor de pecho, falta de aire, déficit neurológico. Y que hubo fatalidad

---

[287] *Íd.*, págs. 96-98.
[288] *Íd.*, págs. 99-104.
[289] *Íd.*, págs. 106-111.
[290] TPO del 11 de octubre de 2018, págs. 3-8.

en el evento. **Y que ella recuerda todo el evento en su totalidad**."[291]

En el contrainterrogatorio, el Dr. Cintrón Roura declaró sobre las heridas, que "[...] si usted nota la herida es como…eh…es más que solamente en un lado".[292] Entiende que la persona estuvo de lado y no frente al agresor.[293] Respecto a la herida en la palma de la mano, indicó que no podía estipular que esta sea compatible con una herida de defensa.[294] Por último, en el redirecto aclaró que no podía estipular que las heridas en el antebrazo sean de defensa.[295]

**16. Agente Rebeca Rosado Rodríguez** (Agente Rosado Rodríguez) (Vistas del 19 y 26 de marzo; 23, 29 y 30 de mayo; y 12 de junio de 2019)

La Agente Rosado Rodríguez fue la agente investigadora del caso. Durante su testimonio en corte, corroboró esencialmente lo declarado por el Agente Ortiz Vargas, así como los demás testimonios ofrecidos durante el juicio. Inclusive, la Agente Rosado Rodríguez indicó que entrevistó a Zuleyka en el Hospital San Lucas y que entrevistó al Agente primario Abiú Torres Rodríguez en la escena. El Agente Torres Rodríguez le expresó que cuando llegó a la escena encontró un cuerpo de una persona tirada frente al Colmado Pérez en el pavimento. Que vio una mujer llorando, quien resultó ser Miosotis y que el Agente Torres Rodríguez le dio instrucciones a la Agente García Pizarro para que la entrevistara. Que también estaba Zuleyka herida en la escena. Que Miosotis le indicó al Agente Torres Rodríguez que Andrés la cogió por los brazos y la tiró al piso. Andrés cayó encima de Miosotis y ella movió a Andrés. **Que Miosotis observó la**

---

[291] *Íd.*, pág. 7.
[292] *Íd.*, pág. 29.
[293] *Íd.*, pág. 30.
[294] *Íd.*, pág. 32.
[295] *Íd.*, pág. 33.

**persona que disparó y que podía identificarlo**. La Agente Rosado Rodríguez también expresó que el Agente Torres Rodríguez se percató que había una segunda persona tirada en la parte de atrás de un vehículo cuando estaba entrevistando a Miosotis. En la escena había dos vehículos: un Toyota Corolla y un Toyota Tacoma, cerca de este último se encontraba el occiso Luna Guzmán.[296]

Además, la testigo declaró que los investigadores forenses ocuparon dos celulares en la escena: uno estaba al lado de un tronco y otro lo tenía Jossie. Que el Investigador Forense Javier Ríos Rosa le hizo entrega de la siguiente evidencia: unas llaves, una cadena eslabonada, un llavero con cinco llaves y unos guantes azules que pertenecían a los paramédicos. La evidencia ocupada fue enviada al ICF.[297] Cuando la testigo llegó a la escena, observó un vehículo Mitsubishi Nativa roja que pertenecía a Miosotis y un vehículo Cherokee propiedad del Sr. Pérez González, dueño del Colmado Pérez.[298] Un tercer vehículo, un Honda Civic color púrpura, propiedad de Zuleyka fue ocupado y llevado a la Comandancia en Ponce, porque al momento de la investigación ella no se encontraba en la escena.[299] La Agente Rosado Rodríguez terminó de examinar la escena entre 5:00 y 5:30 am del 11 de abril de 2016. Ese día preparó el informe de la escena.[300] Mientras estaba en la Comandancia, el Agente Vélez Blay le entregó una confidencia por escrito, una foto de una cuenta de Facebook, un documento de RCI y un documento del Sistema David. Los últimos tres documentos son los Exhibits 66, 67 y 68 del Ministerio

---

[296] TPO del 19 de marzo de 2019, págs. 3-34.
[297] *Íd.*, págs. 35-37 y 45.
[298] *Íd.*, pág. 40.
[299] *Íd.*, págs. 43-44.
[300] *Íd.*, págs. 45-46.

Público. Estos estaban a nombre del Apelante, a quien la Agente Rosado Rodríguez identificó en corte abierta.[301]

Por otro lado, la testigo indicó que entrevistó a la Agente García Pizarro en relación con la entrevista que ella realizó a Miosotis en la escena. La Agente García Pizarro le relató los hechos tal como fueron declarados por Miosotis durante su testimonio.[302] En específico, Miosotis le indicó a la Agente García Pizarro que la persona que disparó a Andrés lo había visto esa misma noche en el Colmado y lo describió como flaco, no muy blanco, perfilado, con las cejas marcadas, de pelo negro, que estaba peinado y vestía un "sweater" blanco.[303] La testigo se percató que en las notas que le entregó la Agente García Pizarro, aparte de la entrevista que hizo a Miosotis, escribió que vio cerca de la escena un vehículo Hyundai Accent con tres individuos adentro.[304]

La testigo también relató que el 11 de abril de 2016, comenzando a las 3:08 pm, entrevistó a Miosotis, junto con el Agente Ortiz Vargas y la Agente García Pizarro, en la casa de los padres del occiso Vargas Ortiz.[305] Miosotis estaba llorando, triste, afectada por lo ocurrido.[306] Durante la entrevista, Miosotis relató esencialmente lo mismo que había declarado en el juicio.[307] Específicamente, respecto a la persona que le disparó a Andrés y a Jossie, Miosotis le indicó que tenía una "t-shirt" blanca, con letras negras al frente, era perfilado, con las cejas arregladas, pelo negro peinado hacia atrás, era flaco y portaba una pistola con un peine negro que sobresalía. Que era la misma persona que había visto anteriormente en la puerta del Colmado Pérez y que podía

---

[301] *Íd.*, págs. 48-54.
[302] *Íd.*, págs. 56-62.
[303] *Íd.*, págs. 61-62.
[304] *Íd.*, pág. 63.
[305] *Íd.*, pág. 66.
[306] TPO del 26 de marzo de 2019, págs. 4-7.
[307] *Íd.*, págs. 8-22, 25 y 35.

identificarlo porque tenía una mirada penetrante.[308] La entrevista duró como media hora.[309]

Luego de la entrevista fue a la Comandancia, donde se encontraba Zuleyka, quien había salido de Centro Médico. Ella tenía sus manos vendadas.[310] Estaba triste y adolorida por las heridas que tenía en sus manos. Entrevistó a Zuleyka aproximadamente a las 7:00 pm en presencia del Agente Ortiz Vargas. El relato que hizo Zuleyka en la entrevista también coincide con lo que declaró durante el juicio.[311] Al finalizar la entrevista, la Agente Rosado Rodríguez le entregó a Zuleyka el vehículo, Honda Civic color rosa, unas llaves, una cadena color dorada, un "wallet" color marrón con sus documentos personales y una cartera color anaranjada. La madre de Zuleyka firmó por los artículos, porque ella no podía hacerlo por las heridas en las manos.[312]

El 12 de abril de 2016, la Agente Rosado Rodríguez fue a corroborar la confidencia y los documentos que había recibido del Agente Vélez Blay. La testigo, junto al Agente Ortiz Vargas, fue a la dirección del Apelante, según surgía en el Sistema David: Calle E Q-9, Barrio El Tuque, Ponce. Allí se encontraba el Apelante frente a la residencia, junto a un primo suyo. También había un vehículo Hyundai Accent color rosa, cuatro puertas que pertenecía al Apelante. La Agente Rosado Rodríguez procedió a entregarle una citación para una rueda de confrontación en la Comandancia el 13 de abril de 2016, a las 3:00 pm. El vehículo fue ocupado para investigación y el ICF lo examinó.[313]

---

[308] Íd., págs. 22-25 y 38-39.
[309] Íd., págs. 39-40
[310] Íd., págs. 40-41.
[311] Íd., págs. 45-55.
[312] TPO del 23 de mayo de 2019, págs. 3-5.
[313] Íd., págs. 8-21.

El 13 de abril de 2016, se realizó la rueda de confrontación. Como parte de los preparativos, la Agente Rosado Rodríguez, junto con el Agente Reynaldo Rodríguez de la División de Servicios Técnicos de Ponce, buscaron a los otros cuatro participantes de la rueda de confrontación y fueron llevados a la Comandancia. Al llegar el Apelante, la Agente Rosado Rodríguez lo pasó al cuarto de entrevistas donde le hizo las advertencias de ley (Exhibit 46 del Ministerio Público), las cuales él inició y firmó. Luego, pasaron al área de Servicios Técnicos, donde sería la rueda de confrontación y el Apelante escogió el número 5. Se les colocó una batola azul y encima el número a todos los participantes, incluyendo al Apelante. Éstos fueron ubicados en un cuarto con un cristal y Miosotis entró a una oficina ubicada al otro lado del cristal donde estaban los cinco participantes. Al abrirse la cortina, Miosotis observó a los participantes e identificó al Apelante, quien tenía el número 5. Miosotis estaba bastante afectada, estaba llorando y fue retirada del cuarto.[314] Se arrestó al Apelante por los hechos ocurridos el 10 de abril de 2016.[315] La Agente Rosado Rodríguez indicó que el Apelante firmó el Acta de Rueda de Confrontación. Destacó, que al final del documento indicaba la renuncia del acusado a su derecho a asistencia de abogado durante la rueda de confrontación. En el documento aparecen como testigos el Agente Ortiz Vargas y la Agente García Pizarro.[316]

Respecto a los dos celulares que se ocuparon en la escena, con los números 787-905-0092 y 787-718-1158, la Agente Rosado Rodríguez declaró, que ambos pertenecían a Zuleyka, pero uno lo tenía Jossie y el otro lo tenía Zuleyka. La testigo

---

[314] *Íd.*, págs. 21-30.
[315] *Íd.*, pág. 34.
[316] *Íd.*, págs. 32-33.

gestionó una orden de allanamiento para los celulares y los llevó al ICF para que se efectuara el registro. La Agente Rosado Rodríguez también corroboró en la Oficina de Licencias de Armas de Fuego que el Apelante no tenía licencia de armas.[317]

En el contrainterrogatorio, la testigo declaró que no entrevistó a los Sres. Pérez Rodríguez y Pérez González. Tampoco entrevistó a las personas que estaban dentro del Colmado cuando ocurrieron los hechos. Desconocía si el Sr. Heri Mass, dueño del vehículo Tacoma gris, se encontraba dentro del negocio y tampoco lo entrevistó.[318] Luego se le mostraron las notas que tomó la Agente García Pizarro cuando entrevistó a Miosotis (Exhibit 64 del Ministerio Público). Indicó que el documento dice "Andrés se voltea y la persona le da, le da de frente".[319] Sin embargo, en la declaración de Miosotis, ella indicó que volteó a Andrés en el suelo, y que él la ayudó porque todavía estaba vivo.[320] Además, se le preguntó a la testigo si entre la descripción que Miosotis le dio del Apelante, indicó que éste "tenía la cara limpia" y respondió en la afirmativa.[321] Específicamente, se le preguntó:

> **LCDO. JOSÉ R. SANTIAGO PERELES:** […] cuando dice que tiene la cara limpia, ¿es que no tiene bigote, no tiene barba? Y quizás no tiene un tatuaje como los que usan de estos de…o algo así, ¿verdad? Que tiene la cara totalmente limpiecita, que no tiene nada que usted pueda identificar como una persona. Esa persona tiene una barba ¿verdad? ¿Qué lo que usted entendió era que no tenía nada en su rostro?
>
> **TESTIGO:** Que estaba limpia.[322]

---

[317] *Íd.*, págs. 36-39.
[318] TPO del 29 de mayo de 2019, págs. 5 y 8-10.
[319] *Íd.*, págs. 50-51 y 59.
[320] *Íd.*, págs. 62-63.
[321] *Íd.*, págs. 85-86.
[322] *Íd.*, págs. 86-87.

Respecto al vehículo que le fue ocupado al Apelante, la testigo declaró que no encontraron material delictivo dentro del vehículo.[323]

Por otro lado, la Agente Rosado Rodríguez declaró que, al finalizar la rueda de detenidos, llevó al Apelante a fichar. En cuanto al "mugshot" del Apelante (Exhibit 2 de la Defensa), indicó que éste no tenía bigote, ni barba y sí tenía un "canda'o".[324] La Defensa le pidió a la testigo que comparara las declaraciones juradas que prestaron los Sres. Pérez Rodríguez y Pérez González con la declaración jurada de Miosotis, para ver si las declaraciones eran compatibles.[325] También la Defensa le preguntó si luego de la rueda de confrontación entrevistó al Apelante. La pregunta fue objetada por el Ministerio Público y solicitó una vista bajo la Regla 109 de Procedimiento Criminal para discutir su admisibilidad. El Ministerio Público objetó que se marcara como Exhibit la Identificación número 5 de la Defensa porque entendía que deseaba utilizarlo para entrar al registro las declaraciones *self serving* del Apelante y la defensa de coartada. El Tribunal examinó la Identificación número 5 de la Defensa. Por su parte, la Defensa indicó que deseaba utilizar el documento, no para establecer la defensa de coartada, sino para fines de impugnación y retiró su solicitud para que fuera admitido como Exhibit de la Defensa.[326] Posteriormente, el Tribunal resolvió que procedía la admisibilidad limitada de la Identificación número 5 de la Defensa.[327]

Continuado el contrainterrogatorio, la Agente Rosado Rodríguez reconoció la Identificación número 5 de la Defensa, la

---

[323] *Íd.*, pág. 100.
[324] TPO del 30 de mayo de 2019, págs. 20-21.
[325] *Íd.*, págs. 31-53.
[326] *Íd.*, págs. 55-71.
[327] TPO del 10 de junio de 2019, pág. 5; TPO del 12 de junio de 2019, págs. 3-4. Véase, además, Resolución del 10 de junio de 2019, Autos Originales JLA2016G0027, Tomo II, págs. 399-400.

cual suscribió el 13 de abril de 2016, día que el Apelante compareció para la rueda de confrontación. La Defensa solicitó la admisibilidad del documento, el cual fue admitido como Exhibit 5 de la Defensa, conforme al "rulling" del Tribunal. A petición de la Defensa, las partes excluidas por la determinación anterior se dejaron como evidencia ofrecida y no admitida.[328]

En cuanto al "mugshot" del Apelante, la Agente Rosado Rodríguez reconoció que éste tenía una "goatee" o "chiva".[329] Aceptó que, en la rueda de confrontación, maquilló la cara del Apelante y que nadie la instruyó a hacerlo.[330] También aceptó que no maquilló al participante número 1.[331]

En el redirecto, la testigo explicó que maquilló a los participantes tres y cinco, porque ambos tenían vellos en la barbilla y debía ponerlos igual que los demás participantes en la rueda de confrontación, sin vellos en la cara.[332]

**17. Sra. Aracelis Echevarría Rivera** (Seróloga Forense Echevarría) (Vista del 22 de mayo de 2019)

La Sra. Echevarría es Seróloga Forense en el ICF. Durante su testimonio se admitieron sin oposición de la Defensa, cuatro Certificados de Análisis Forenses de ADN (original, enmendado, explicativo y suplementario), que ella preparó relacionados con los occisos Luna Guzmán y Vargas Ortiz, los cuales fueron marcados como Exhibits 69 al 72 del Ministerio Público.[333] Además, se usaron los Exhibits 6, 21, 27 al 29 y 38.

La Seróloga Forense declaró que realizó unos exámenes de muestras tomadas durante las autopsias de los occisos Vargas Ortiz y Luna Guzmán y otra tomada a Zuleyka. También le

---

[328] TPO del 12 de junio de 2019, págs. 4-10.
[329] *Íd.*, pág. 37 y 40-42.
[330] *Íd.*, pág. 53.
[331] *Íd.*, págs. 68-70.
[332] *Íd.*, págs. 91-93.
[333] TPO del 22 de mayo de 2019, págs. 12-15.

refirieron dos pedazos de alfombra levantados de un vehículo Hyundai Accent color rosa de cuatro puertas, tablilla IIT 711, que había reaccionado a una prueba de luminol hecha por la policía en la escena. La testigo declaró que de las comparaciones realizadas a las muestras tomadas en la escena encontró los perfiles genéticos de ambos occisos y de Zuleyka. Respecto a la muestra del pedazo de alfombra, indicó que no detectó material genético con valor suficiente para poder obtener un perfil genético. Realizó un análisis adicional de cromosoma "Y" y detectó un perfil genético del cromosoma "Y", correspondiente a un varón, inconcluso.[334]

**18.   Sr. Antonio Matías Rodríguez** (Químico Forense Matías) (Vista del 22 de mayo de 2019)

El Sr. Matías trabajó como Químico Forense en el ICF hasta el 2018 cuando se retiró. Su capacidad fue estipulada por la Defensa. Declaró que preparó un Certificado de Análisis Químico Forense (Exhibit 73 del Ministerio Público, sin oposición de la Defensa). Para el 27 de abril de 2016, se le asignó el análisis de una gorra de pelotero, color negro, con visera verde y un logo al frente de un toro, Chicago Bulls. La parte posterior de la gorra tenía una inscripción Michelle Ness. El testigo declaró que la gorra tenía cinco orificios redondos: dos por el lado izquierdo y tres por la parte posterior, que había causado desgarre en ambos lugares. Al analizarla, encontró residuos de plomo, dentro y fuera de la gorra, en los orificios y desgarres, que son los residuos comúnmente hallados cuando hay disparos de armas de fuego. Indicó que había mucho más plomo dentro de la gorra que afuera. Concluyó que los residuos son consistentes con residuos de disparos producto de varios disparos de una o más armas de

---

[334] *Íd.*, págs. 16-80.

fuego, pero no puede establecer que correspondan a un solo disparo o que provienen de una o más de un arma de fuego.[335]

**19.  Dra. Rosa Marian Rodríguez Castillo** –(Dra. Rodríguez Castillo) (Vista del 13 de junio de 2019)

Previo al interrogatorio de la Dra. Rodríguez Castillo, la Defensa estipuló su capacidad como Patóloga Forense del ICF y el hecho que realizó las autopsias de ambos occisos en este caso.[336] También se admitieron los Informes Médico Forenses, PAT-1743-16 del occiso Luna Guzmán (Exhibit 75 del Ministerio Público, sin objeción de la Defensa) y PAT-1744-16 del occiso Vargas Ortiz (Exhibit 76 del Ministerio Público, sin objeción de la Defensa).[337]

Respecto al occiso Luna Guzmán, la Dra. Rodríguez Castillo declaró que éste vestía una "T-shirt" negra, "boxer" vino con diseños, mahón largo azul claro, correa negra de tela, medias negras de algodón y tenis gris y verde. Observó que el occiso tenía un parcho de electrocardiograma en el antebrazo izquierdo, compatible con tratamiento médico brindado por paramédicos y múltiples tatuajes en diferentes partes en la superficie corporal.[338] Antes de continuar el interrogatorio, la Defensa estipuló la totalidad del contenido de los dos Protocolos de Autopsias (Exhibits 75 y 76 del Ministerio Público).[339] Posteriormente, la Dra. Rodríguez Castillo declaró que la autopsia practicada al occiso Luna Guzmán surge que éste tenía ocho heridas de balas producidas por un arma de fuego y recibidas a más de dos pies, identificadas con las letras "A" a la "H", la mayoría de estas con entrada por la parte posterior de la víctima, además tres evidencias de trauma y abrasiones en el rostro compatibles con la

---

[335] *Íd.*, págs. 91-102.
[336] TPO del 13 de junio de 2019, págs. 1-4.
[337] *Íd.*, págs. 6-17.
[338] *Íd.*, págs. 18-21.
[339] *Íd.*, págs. 23-25.

caída causada por los impactos de bala.[340] En relación al análisis toxicológico, surge que el occiso Luna Guzmán tenía alcohol en la sangre y orina.[341] La Dra. Rodríguez Castillo concluyó que el occiso murió a causa de las heridas de balas recibidas.[342] Además, la testigo recuperó cinco piezas de evidencia en el cuerpo del occiso Luna Guzmán que sometió para análisis pertinente por un perito de armas de fuego.[343]

Sobre el occiso Vargas Ortiz, la Dra. Rodríguez Castillo declaró que éste vestía una "T-shirt" roja con diseños, mahón largo azul, correa de tela color negro, medias negras, "boxer" gris y tenis rojos. Observó que el occiso tenía un tatuaje que dice "Andrés" en la pierna izquierda y tenía cuatro parchos de electrocardiograma, dos en la pierna derecha y dos en la pierna izquierda.[344] La Dra. Rodríguez Castillo declaró que, la autopsia practicada al occiso Luna Guzmán surge que, éste tenía 18 heridas de bala compatibles con armas de fuego, identificadas de la "A" a la "Q", con entradas por diferentes partes del cuerpo compatibles con movimientos de defensa a causa de los impactos de bala y otras recibidas de espalda.[345] En relación a la herida de bala "C", declaró que era una herida de defensa localizada en el antebrazo izquierdo y que ahí recuperó un proyectil blindado porque la herida no tenía salida.[346] Explicó que mientras removía la ropa del occiso, salió un proyectil blindado y que no podía determinar a cuál de las heridas correspondía.[347] Además, indicó que el occiso tenía evidencia de traumas de abrasión en la región abdominal

---

[340] *Íd.*, págs. 31-46.
[341] *Íd.*, pág. 47.
[342] *Íd.*, págs. 47-48.
[343] *Íd.*, págs. 50-54.
[344] *Íd.*, págs. 54-56.
[345] *Íd.*, págs. 56-85.
[346] *Íd.*, págs. 62-63.
[347] *Íd.*, pág. 85.

izquierda y una laceración en la región parietal izquierda o "rajadita" de cabeza limitada a la piel sin fractura.[348] Explicó que la abrasión abdominal no fue causada por un objeto y es compatible con que tuvo algún contacto sobre una superficie lubosa y que la camisa se le subió antes de caer al piso. En cuanto a la laceración en la cabeza, declaró que esta es compatible con entrar en contacto con algo filoso en la superficie, como una piedra, pero que no fue propinado.[349]

En relación con el análisis toxicológico, surge que el occiso Vargas Ortiz tenía alcohol en la sangre y orina y, al igual que el occiso Luna Guzmán, tampoco reflejaba la presencia de sustancias controladas al momento de su muerte.[350] La Dra. Rodríguez Castillo concluyó que la causa de muerte del occiso Vargas Ortiz fueron las heridas de bala y homicidio, sin acepción jurídica.[351] Por último, se le mostraron a la testigo los Exhibits 16 y 17 del Ministerio Público, sin objeción de la Defensa, los cuales reconoció como las piezas de evidencias recuperadas en los cuerpos de los occisos Vargas Ortiz y Luna Guzmán, iniciadas por ella y remitidas al área de balística el 12 de abril de 2016, para que fueran analizados. Para ello usó los formularios correspondientes en los que consignó la solicitud de análisis (Exhibits 26 y 29 del Ministerio Público, sin objeción de la Defensa).[352]

En el contrainterrogatorio, la Dra. Rodríguez Castillo declaró que, al recibir el cuerpo del occiso Vargas Ortiz, vio que su ropa estaba ensangrentada, aunque no recordó cuánto. Respecto a las heridas de la "I" a la "Q", declaró que estas fueron recibidas de espalda y tienen entrada y salida. Opinó que pudo haber causado

---

[348] *Íd.*, pág. 86.
[349] *Íd.*, págs. 86-87.
[350] *Íd.*, págs. 87-88.
[351] *Íd.*, pág. 88.
[352] *Íd.*, págs. 89-92.

la salida de sangre, pero también pudo causar que esta se acumulara en las cavidades del cuerpo.[353] Estimó, considerando la cantidad de sangre hallada en el cuerpo, que el occiso perdió una cantidad masiva de sangre, pero solo pudo establecer lo que cuantificó en el momento de la autopsia. La cantidad total "[n]o la puedo establecer".[354] Coincidió con la Defensa, que una persona que haya recibido muchos impactos de bala de entrada y salida debería dejar algún patrón de sangre sobre la superficie en la que cayó.[355] Además, aclaró que su conclusión sobre la existencia de heridas de defensa en los brazos, manos y piernas fue hecha en el contexto forense. Añadió que, por su experiencia, una persona no se queda estática y se defiende ante una agresión física, sea por herida de arma blanca o herida de bala. Por ejemplo, hay personas que podrían correr, brincar, girar, moverse y huir de la escena para defenderse de alguna manera.[356] Respecto al occiso Vargas Ortiz declaró que, podría ser una probabilidad que una vez este cayó al suelo, alguien moviera el cuerpo y lo ponga de frente.[357]

En el redirecto, el Ministerio Público le preguntó a la testigo si había la posibilidad de que las heridas las recibiera el occiso Vargas Ortiz en la parte posterior, al voltearse y caer en un área, luego de agarrar a alguien. Al respecto, la Dra. Rodríguez Castillo aclaró lo siguiente:

> **R.** Es que hay que, hay que recordar que uno tiene una actividad física. Uno, uno un movimiento lo hace tan rápido.
> […]
> **R.** Me voy a defender. Me voy a mover. Tengo esta herida. Caí aquí. O sea, que es una cosa tan rápida que puede ser que en ese proceso él caiga o alguna persona también lo pueda ayudar en ese

---

[353] *Íd.*, págs. 95-97.
[354] *Íd.*, págs. 97-100.
[355] *Íd.*, págs. 100-102
[356] *Íd.*, págs. 103-108.
[357] *Íd.*

momento defendiéndose, lo cual cayó encima o le cayó otro, lo empujó el otro. O sea, pero sí le puedo decir que tuvo una actividad física y las, y las heridas las recibió y tiene unos movimientos. Las recibió en la gran mayoría de la espalda.[358]

Finalmente, en cuanto a la herida en la cabeza, la Dra. Rodríguez Castillo expresó que ocurrió cuando la cabeza hizo contacto con una superficie y no tiene características de un objeto específico. Una de las muchas probabilidades de como recibió la herida en la cabeza pudo haber sido en el momento que la persona es volteada de frente.[359]

**20.   Sr. Abdiel Ramírez Negrón** (Examinador Ramírez Negrón) (Vistas del 13 de junio y 11 de julio de 2019)

El Examinador Ramírez Negrón es Examinador de Armas de Fuego del ICF. Durante su testimonio se usaron los Exhibits 14 al 20, 24 al 26 y 30 del Ministerio Público, sin objeción de la Defensa, el Certificado de Análisis preparado por él y el expediente del AF-16-0579 (Exhibits 77 y 78 del Ministerio Público).

Declaró que el 14 de julio de 2016, recibió dos proyectiles y sus derivados, referidos por el Área de Patología, que fueron levantados durante la autopsia realizada por la patóloga Dra. Rodríguez Castillo a los occisos Vargas Ortiz y Luna Guzmán (PA-16-0159 y P-16-0560). Además, el 5 de agosto de 2016 a las 11:41 am, recibió trece proyectiles y/o sus derivados y treinta y dos casquillos de balas calibre .40. Todo esto para realizar un análisis de comparación microscópica y determinación de tipo y calibre, en el caso de los proyectiles.[360]

El Examinador Ramírez Negrón declaró que el Exhibit 14 del Ministerio Público, sin objeción de la Defensa, corresponde a la pieza 1 (008), que incluyen 13 proyectiles de bala y subderivados

---

[358] *Íd.*, págs. 113-114.
[359] *Íd.*, pág. 114.
[360] TPO del 10 de julio de 2019, págs. 9-14 y 19-22.

levantados en la escena y marcados del E1 al E13. Determinó que los casquillos de balas marcados E11 al E13 correspondían a proyectiles de bala sin características propias de comparación. Que no tienen las características individuales para poder determinar si fueron disparado por una misma arma de fuego.[361] El Exhibit 15 del Ministerio Público, sin objeción de la Defensa, corresponde a la pieza 2 (009), que incluyen 32 casquillos levantados en la escena y marcados del E1 al E32.[362] En cuanto a los casquillos de balas marcados del E1 al E13 descritos en la pieza 2 del caso AF16-0579, todos son calibre .40 y fueron disparados por una misma arma de fuego. Que los casquillos marcados del E14 al E32 son calibre .40 y fueron disparados por una misma arma de fuego. **Además, los proyectiles subderivados marcados del E1 al E6 descritos en la pieza 1 del caso AF16-0579 y los proyectiles subderivados marcados del E14 y E15 de la pieza 3 del caso P-16-0159, recuperadas en el cuerpo del occiso Vargas Ortiz (Exhibit 16 del Ministerio Público, sin objeción de la Defensa), son calibre .40 y fueron disparados por una misma arma de fuego.**[363]

Por otro lado, en cuanto a la pieza 4 de la patología del occiso Luna Guzmán (P-16-0160), el Examinador Ramírez Negrón determinó que los marcados E1 y E17 son calibre .40 y fueron disparados por una misma arma de fuego. Los marcados del E7 al E10 y el E18 son calibre .40 y fueron disparados por una misma arma de fuego. En específico, la pieza E10 que se encontró en la escena, es un fragmento de blindaje proyectil de bala y no pudo determinar qué tipo de proyectil es debido a su mutilación. En el

---

[361] *Íd.*, págs. 22-23 y 38-39.
[362] *Íd.*, págs. 24-25.
[363] *Íd.*, págs. 25, 40-41 y 47.

caso de las piezas E19 y E20 son proyectiles de bala que no tienen características propias de comparación.[364] Añadió que, los fragmentos de blindaje E16 y E17 fueron disparados por una misma arma de fuego y el E18 fue disparado por otra arma de fuego. Respecto a las piezas E19 y E20, no pudo realizar una determinación. **Concluyó que la evidencia recuperada en ambos cuerpos (occisos Luna Guzmán y Vargas Ortiz) en las respectivas autopsias provenían de la misma arma de fuego**.[365] Por último, declaró que las piezas de evidencia cercanas al occiso Vargas Ortiz, marcadas E3 y E5 pertenecen a la misma arma de fuego y la pieza de evidencia cercana al occiso Luna Guzmán, marcada E4, pertenece a la misma arma de fuego.[366] Las armas de fuego que se usaron se les puede añadir abastecedores de más capacidad.[367]

En el contrainterrogatorio, el Examinador Ramírez Negrón declaró que no era posible determinar de cual casquillo salía un proyectil determinado y solo podía determinar si eran de una misma arma de fuego.[368]

**B.    Resumen de la prueba testifical de la Defensa:**

**1.    Sr. Wilfredo Rivera Marrero** (Sr. Rivera Marrero) (Vistas del 11 y 25 de septiembre y 1 de octubre de 2019)

El Sr. Rivera Marrero tiene 30 años y se encuentra confinado en la institución 676 en Ponce desde el 7 de octubre de 2016. Declaró que conoció al Apelante en la institución penal, a quien identificó en corte abierta. Llevaba alrededor de una semana confinado cuando conoció al Apelante. Indicó que no había visto al Apelante antes de ingresar en la institución, ni conoce a su

---

[364] *Íd.*, págs. 42-46.
[365] *Íd.*, págs. 48-49; TPO del 11 de julio de 2019, págs. 24-25.
[366] TPO del 11 de julio de 2019, pág. 25.
[367] *Íd.*, pág. 31.
[368] *Íd.*, pág. 85.

familia.[369] Explicó que tiene una cuenta en Facebook desde el 2013[370] y fue ahí donde conoció a Miosotis hace alrededor de dos años antes de estar confinado.[371] Esto a raíz de la muerte de su hermana.[372] Explicó que se comunicaron por medio de Messenger en Facebook, intercambiaron sus números de teléfono, empezaron a conocerse y luego, tuvieron una relación sentimental.[373] La relación duró alrededor de "un año y pico" y se mantuvieron en comunicación hasta tres semanas o un mes antes de que a él lo arrestaran.[374] Cuando empezó su relación con Miosotis, ella tenía un vehículo Corolla y cuando lo ingresaron en la institución, Miosotis tenía una Nativa roja, pero no recuerda cuando ella cambió el vehículo.[375]

Posteriormente, la Defensa intentó usar la identificación 7 de la Defensa. El Ministerio Público objetó. Lo anterior resultó en argumentaciones orales entre el Ministerio Público y la representación legal del Apelante. El Tribunal determinó permitir que la Defensa le mostrara al Sr. Rivera Marrero la identificación 7 de la Defensa.[376] La Defensa preguntó al Sr. Rivera Marrero la fecha de la foto de su cuenta de Facebook y este respondió que era de noviembre de 2016.[377] Sin embargo, ante una objeción del Ministerio Público para que se le realizarán las advertencias al testigo sobre su derecho a no autoincriminarse por hechos ocurridos mientras se encuentra sumariado, pendiente de que concluya su procesamiento judicial, el Tribunal le asignó a un abogado para que lo orientara. Luego de esto, el Sr. Rivera

---

[369] TPO del 11 de septiembre de 2019, págs. 6-7.
[370] *Íd.*, pág. 24.
[371] *Íd.*, pág. 16
[372] *Íd.*, pág. 8.
[373] *Íd.*, págs. 11-12 y 20.
[374] *Íd.*, pág. 25.
[375] *Íd.*, pág. 26.
[376] *Íd.*, págs. 27-40.
[377] *Íd.*, págs. 42-46.

Marrero indicó que entendió la orientación, por lo que deseaba ampararse en su derecho a no autoincriminarse y no deseaba seguir declarando. El Tribunal lo dejó citado para una fecha posterior y le advirtió que al declarar levantara el derecho a no autoincriminarse cuando entendiera que debía hacerlo.[378]

Continuado el interrogatorio, el Sr. Rivera Marrero identificó a Miosotis como la persona cuya imagen aparece en las fotos marcadas como Identificaciones 7 y 8 de la Defensa.[379] Tras una extensa argumentación de las partes, las fotografías fueron admitidas como Exhibits 6 y 7 de la Defensa, limitada a establecer que la Sra. Meléndez es la persona en las fotografías.[380]

Sobre el Apelante, el testigo declaró que era inocente y que ambos conversaron.[381] Indicó que el 6 de abril de 2016, estaba en la libre comunidad y que para ese tiempo tenía comunicación con Miosotis casi todos los días, pero no recordaba si ese día en particular tuvo algún tipo de comunicación con ella.[382] Luego, recordó que ellos se comunicaron entre el 6 y 10 de abril de 2016, por medio de Messenger de la cuenta de Facebook que él había abierto. Entiende que los mensajes enviados por Messenger deberían estar en dicha aplicación.[383] No habló sobre el contenido porque el Ministerio Público objetó la línea de preguntas de la Defensa por entender que era prueba de referencia.[384] Posteriormente, la Defensa intentó establecer que las Identificaciones 14, 15, 16 y 17 provenían de la cuenta en Facebook del Sr. Rivera Marrero. El Ministerio Público planteó que la Defensa no había descubierto los documentos durante el

---

[378] *Íd.*, págs. 46-51; TPO del 12 de septiembre de 2019, págs. 8 y 11-13.
[379] TPO del 25 de septiembre de 2019, págs. 44-51.
[380] *Íd.*, págs. 51-65.
[381] *Íd.*, págs. 79-82.
[382] *Íd.*, págs. 82-84.
[383] *Íd.*, págs. 89 y 101-105.
[384] *Íd.*, págs. 107-108.

descubrimiento de prueba a favor del Estado, a pesar de que pretendía someterlos como evidencia sustantiva, ni se los mostró a la Sra. Meléndez durante el contrainterrogatorio. El Tribunal, estando el Apelante fuera de sala, añadió que la Defensa no sentó las bases para la autenticación y admisibilidad de los documentos.[385] Que si la defensa pretendía impugnar el testimonio de la Sra. Meléndez debió cumplir con su deber continuo de descubrir prueba a la otra parte, inclusive debió haber usado los documentos cuando ella estaba declarando y no lo hizo.[386]

Por otro lado, el testigo declaró que no conocía al occiso Vargas Ortiz y que no conocía dónde vivía Miosotis del 6 al 10 de abril de 2016 o con quien vivía, pero sabía que tenía hijos.[387]

En la siguiente vista celebrada el 1 de octubre de 2019, la Defensa solicitó al Tribunal que declarara al Sr. Rivera Marrero como testigo hostil y le permitiera formular sus preguntas de manera sugestiva, pues el testigo contestaba con evasivas y expresaba que no recordaba. El Ministerio Público se opuso. El Tribunal denegó la solicitud de la Defensa por entender que en este caso no se daban los elementos para que se permitiera hacer las preguntas sugestivas. Así, determinó que el Sr. Rivera Marrero no estaba identificado con la parte adversa, no había mostrado pobre expresión o deficiencia mental, era mayor de edad, había sido responsivo y las respuestas en las que dijo que no recordaba no fueron por razón de pudor. Además, el testigo fue orientado por un abogado sobre su derecho a no autoincriminarse.[388]

---

[385] *Íd.*, págs. 110-116 y 122-137.
[386] *Íd.*, págs. 140-159.
[387] *Íd.*, págs. 117-120.
[388] TPO del 1 de octubre de 2019, págs. 3-28.

Continuado el interrogatorio, el Sr. Rivera Marrero declaró que no tuvo comunicación con Miosotis el 5 de mayo de 2016.[389] Luego, la Defensa le preguntó si tuvo alguna conversación con Miosotis el 6 de abril de 2016 y el testigo respondió:

> **R:** Juez, es que yo no puedo contestar más preguntas.
>
> **Juez:** ¿Por qué?
>
> **R:** Porque no.
>
> **Juez:** ¿Tiene alguna razón?
> […]
> **R:** No puedo contestar más preguntas. Ya ya contesté las preguntas que iba a contestar.
> […]
> **Juez:** Por eso, ¿qué, qué razón usted tiene para no contestar? ¿Qué razón, si alguna, tiene para no contestar las preguntas?
>
> **R:** Pues, ya contesté las que iba a contestar.
>
> **Juez:** ¿O sea, que no va a contestar ninguna otra pregunta?
>
> **R:** No.[390]

En respuesta, la Defensa solicitó impugnar a su testigo. El Tribunal no lo permitió, concluyendo que el abogado estaría convirtiéndose en un testigo como parte del proceso. Finalmente, la Defensa no hizo más preguntas al testigo.[391]

**2.    Sr. José Rivera Navarro** (Sr. Rivera Navarro) (Vista del 12 de septiembre de 2019)

El Sr. Rivera Navarro es empleado de la Compañía Claro en Guaynabo y trabajó en el área de Coordinador de Servicios de Seguridad aproximadamente cuatro años. En esa posición sus funciones eran contestar requerimientos de agencias de orden público y los tribunales locales y federales.[392] Al mostrársele la

---

[389] *Íd.*, págs. 29 y 31.
[390] *Íd.*, págs. 32-34.
[391] *Íd.*, págs. 35-46.
[392] TPO del 12 de septiembre de 2019, pág. 15.

Identificación 12 de la Defensa, el testigo declaró que el 6 de abril de 2017, recibió mediante fax una orden de 12 de enero de 2017, en la que se le requirió información relacionada al número de teléfono 787-553-3623 y el rango de llamadas recibidas o realizadas entre el 10 y 11 de abril de 2016. Indicó que obtuvo la información de la base de datos de Claro.[393] Posteriormente, el Ministerio Público objetó que el testigo declarara sobre el contenido del documento marcado como Identificación 12 de la Defensa. El Tribunal se reservó su admisibilidad, pendiente que se estableciera la pertinencia en el caso. Luego de las argumentaciones entre el Ministerio Público y la representación legal del Apelante, el Tribunal permitió a las partes hacer preguntas sobre el contenido del documento sujeto a que se admitiera finalmente.[394]

Luego de explicar la información contenida en el documento,[395] el Sr. Rivera Navarro declaró que Claro no guarda contenido de mensajes de texto, ni de las aplicaciones como Messenger o Facebook, ya que no existe ley federal que obligue a las compañías de teléfono a guardar el contenido de los mensajes de texto.[396] En cuanto al número 787-553-3623, declaró que hubo varias llamada originadas, recibidas o intentadas el 10 de abril de 2016, entre las 9:34:05 y 9:54:16 pm.[397] Sobre los mensajes de texto, indicó que la base de datos no tiene el contenido, sino el tránsito entre los números que los intercambiaron. Afirmó que Claro no puede alterar la información contenida en un teléfono.[398]

---

[393] *Íd.*, págs. 18-19.
[394] *Íd.*, págs. 19-27. En la vista del 1 de octubre de 2019, a las págs. 54-57, el TPI permitió que el documento se marcara como Exhibit 6 de la Defensa.
[395] *Íd.*, págs. 27-29.
[396] *Íd.*, pág. 30.
[397] *Íd.*, págs. 31-33.
[398] *Íd.*, págs. 33 y 36.

En el contrainterrogatorio, el Sr. Rivera Navarro declaró que la orden del 12 de enero de 2017, le requirió información relacionada a los mensajes de texto enviados o recibidos, ya sea por Messenger, Facebook, Instagram, WhatsApp o cualquier otro medio de mensajería. Amplió que dichas aplicaciones son independientes y funcionan a discreción del usuario del teléfono, por lo que Claro no tiene acceso a su contenido y que conocía que existía una aplicación que registra los números falsos o "fake numbers".[399] También indicó que el número 787-553-3623 correspondía a un teléfono prepagado. Explicó que un número prepagado, se puede comprar en cualquier lugar y que, la persona no está obligada a registrarlo, ni proveer sus datos personales o identificación para usarlo. A preguntas del Tribunal, el Sr. Rivera Navarro indicó que desconoce quién es el dueño del número 787-553-3623, porque al no tener suscriptor las llamadas salen a nombre de "Mr. Claro 2016".[400]

Culminados todos los trámites de rigor, el 20 de febrero de 2020, el Tribunal dictó las Sentencias por todos los cargos imputados. Inconforme, el 14 de julio de 2020,[401] el Apelante presentó el recurso que nos ocupa en el que señala los siguientes errores:

> **PRIMER ERROR:**
> **Incurrió en *abuso de discreción* en tal medida que cometió ERROR MANIFIESTO el TPI en la *apreciación de la prueba desfilada* ante su consideración y así encontrar culpable al acusado, ahora apelante, de los delitos según imputados. Máxime cuando dicha prueba no estableció su culpabilidad más allá de duda razonable, siendo dicho ERROR MANIFIESTO de tal naturaleza que[,] de no haberse**

---

[399] *Íd.*, págs. 39-40.
[400] *Íd.*, págs. 40-42.
[401] Luego de diversos incidentes relacionados al trámite apelativo del presente recurso, este Tribunal dejó sin efecto una Sentencia que había dictado el 30 de noviembre de 2021.

**cometido, el resultado hubiere sido distinto, decretándose la absolución del acusado.**

**SEGUNDO ERROR:**
**Incurrió en *abuso de discreción* en tal medida que cometió ERROR MANIFIESTO el Honorable Tribunal de Instancia *en la implementación y aplicación del Derecho* a los hechos y planteamientos expuestos ante su consideración. Dicho ERROR MANIFIESTO fue de tal naturaleza[] que[,] de por sí o en unión al primer señalamiento, ocasionó el que el Honorable Tribunal errara en su determinación y encontrar al acusado, culpable de los delitos imputados.**

## II.

## A.

La Constitución de Puerto Rico garantiza a todos los ciudadanos el derecho fundamental a la presunción de inocencia en todo proceso criminal. Art. II, Sec. 11, Const. E.L.A., LPRA, Tomo 1. Para controvertir esta presunción, se le exige al Ministerio Público la presentación de prueba que establezca la culpabilidad del acusado más allá de duda razonable. Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, R. 110; Pueblo v. García Colón I, 182 DPR 129, 174 (2011); Pueblo v. Irizarry, 156 DPR 780, 786 (2002); Pueblo v. Cabán Torres, 117 DPR 645, 652 (1986). Ello requiere que el Estado presente prueba suficiente respecto todos los elementos del delito y su conexión con el acusado. Pueblo v. Toro Martínez, 200 DPR 834 (2018); Pueblo v. Casillas, Torres, 190 DPR 398, 413-414 (2014); Pueblo v. García Colón I, *supra*. Para ello, la culpabilidad del acusado no tiene que probarse con certeza matemática. Pueblo v. Toro Martínez, *supra*; Pueblo v. Casillas, Torres, *supra*, pág. 414; Pueblo v. Feliciano Rodríguez, 150 DPR 443, 447 (2000); Pueblo v. Bigio Pastrana, 116 DPR 748, 761 (1985). La evidencia directa de un testigo que merezca entero crédito es prueba suficiente de cualquier hecho.

Pueblo v. Chévere Heredia, 139 DPR 1, 16 (1995); Pérez v. Acevedo Quiñones, 100 DPR 894 (1972). El testimonio, de ser creído, es suficiente en derecho para sostener un fallo condenatorio, aun cuando no sea un testimonio "perfecto". Pueblo v. Chévere Heredia, *supra*, pág. 15.

Así que, para superar la duda razonable, lo que se requiere es prueba suficiente que "produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido". Pueblo v. Toro Martínez, *supra*; Pueblo v. Casillas, Torres, *supra*, págs. 414-415; Pueblo v. García Colón I, *supra*, págs. 174-175. En ese sentido, la duda razonable para rebatir la presunción de inocencia reconocida por nuestra Constitución no es una mera duda especulativa o imaginaria, o cualquier duda posible, es la insatisfacción con la prueba lo que se conoce como "duda razonable". Pueblo v. Toro Martínez, *supra*; Pueblo v. Casillas, Torres, *supra*, pág. 415. Más bien, es aquella duda producto de una consideración justa, imparcial y serena de la totalidad de la evidencia del caso. Pueblo v. Casillas, Torres, *supra*, pág. 415; Pueblo v. García Colón I, *supra*, pág. 175.

En esta función, los jueces de primera instancia y los jurados están en mejor posición de apreciar y aquilatar la prueba y los testimonios presentados, por lo que su apreciación de la prueba merece gran respeto y deferencia por parte de los foros apelativos. Pueblo v. Casillas, Torres, *supra*, pág. 416; Pueblo v. Rodríguez Pagán, 182 DPR 239 (2011); Pueblo v. Acevedo Estrada, 150 DPR 84, 99 (2000); Pueblo v. Echevarría Rodríguez I, 128 DPR 299, 316 (1991). El juzgador de los hechos es "quien tiene la oportunidad de verlos y observar su manera de declarar, de poder apreciar sus gestos, titubeos, contradicciones, manerismos, dudas, vacilaciones y, por consiguiente, de ir

formando gradualmente en su conciencia la convicción en cuanto a si dicen la verdad". Pueblo v. Toro Martínez, *supra*, citando a Pueblo v. García Colón I, *supra*, pág. 165, y a Argüello v. Argüello, 155 DPR 62, 78 (2001).

Al enfrentarse a la tarea de revisar cuestiones relativas a convicciones criminales, el Tribunal Supremo ha reiterado que,

> los tribunales apelativos sólo intervendremos con dicha apreciación cuando se demuestre la existencia de pasión, prejuicio, parcialidad o error manifiesto. Sólo ante la presencia de estos elementos y/o cuando la apreciación de la prueba no concuerde con la realidad fáctica o ésta sea inherentemente imposible o increíble, habremos de intervenir con la apreciación efectuada.

Pueblo v. Irizarry, *supra*, págs. 788-789. Véase, además, Pueblo v. Toro Martínez, *supra*.

Así, a menos que existan las situaciones antes señaladas, el tribunal apelativo se abstendrá de intervenir con la apreciación de la prueba. Pueblo v. Acevedo Estrada, *supra*, pág. 86.

Por otro lado, se consideran claramente erróneas las conclusiones del foro revisado "si de un análisis de la totalidad de la evidencia, este Tribunal queda convencido de que se cometió un error, [...] [porque] las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida". Pueblo v. Toro Martínez, *supra*. Es decir, consideramos que se incurre en un error manifiesto cuando "la apreciación de esa prueba se distancia de la realidad fáctica o es inherentemente imposible o increíble". Pueblo v. Toro Martínez, *supra.*

### B.

En nuestro ordenamiento penal se ha tratado el delito de asesinato como un solo delito, pero dividido en grados. Se agrupan en la definición de "asesinato" todas aquellas

modalidades en las que exista la intención de matar. Pueblo v. Roche, 195 DPR 791, 797 (2016). En lo aquí pertinente, el Artículo 92 del Código Penal de 2012, según enmendado, dispone que el "[a]sesinato es dar muerte a un ser humano a propósito, con conocimiento o temerariamente". 33 LPRA sec. 5141. Este delito está dividido en distintos grados "atendiendo a la perversidad demostrada por el acusado al cometer el acto y al sólo efecto de la imposición de la pena". Pueblo v. Negrón Ayala, 171 DPR 406, 418 (2007). El Artículo 93 del referido código define las modalidades de asesinato en primer grado y segundo grado. Constituye asesinato en primer grado cuando es "perpetrado por medio de veneno, acecho, tortura, o **a propósito o con conocimiento**". (Énfasis suplido). 33 LPRA sec. 5142 (a)

El delito de asesinato en primer grado requiere que sea cometido con conocimiento. Como norma general, en nuestro sistema de derecho existe una presunción de sanidad o capacidad mental. Rivera y otros v. Bco. Popular, 152 DPR 140 (2000); Jiménez v. Jiménez, 76 DPR 718, 733 (1954). Véanse también Pueblo v. Marcano Pérez, 116 DPR 917, 927 (1986); Pueblo v. Alsina, 79 DPR 46, 60 (1956).

En cuanto a la tentativa de delito, el Artículo 35 del Código Penal, la regula como la que ocurre "cuando la persona actúa con el propósito de producir el delito o con conocimiento de que se producirá el delito, y la persona realiza acciones inequívoca e inmediatamente dirigidas a la consumación de un delito que no se consuma por circunstancias ajenas a su voluntad". 33 LPRA sec. 5048.

## C.

El Artículo 5.04 de la Ley Núm. 404-2000, 25 LPRA secs. 455 y ss.[402], establece, en lo pertinente, que:

> Toda persona que **transporte** cualquier arma de fuego o parte de ésta, sin tener una licencia de armas, **o porte** cualquier arma de fuego sin tener su correspondiente **permiso para portar armas**, incurrirá en delito grave y convicta que fuere, será sancionada con pena de reclusión por un término fijo de diez (10) años, sin derecho a sentencia suspendida, a salir en libertad bajo palabra, o a disfrutar de los beneficios de algún programa de desvío bonificaciones o alternativa a la reclusión reconocida en esta jurisdicción, debiendo cumplir en años naturales la totalidad de la pena impuesta. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de veinte (20) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de cinco (5) años. […] (Énfasis suplido). 25 LPRA sec. 458.

De lo anterior surge que la portación no autorizada puede darse porque la persona transportara un arma o parte de ésta sin licencia, o porque la persona portara un arma de fuego sin permiso de portación.

Sobre lo que constituye *portar*, la propia Ley define el concepto como "[l]a posesión inmediata o la tenencia física de un arma, cargada o descargada, sobre la persona del portador, entendiéndose también cuando no se esté transportando un arma de conformidad a como se dispone en este capítulo". Art. 1.02(s) de la Ley 404-2000, 25 LPRA sec. 455(s). Igualmente, define *transportación* como "la posesión mediata o inmediata de un arma, con el fin de trasladarla de un lugar a otro (…)". Art. 1.02(x) de la Ley 404-2000, 25 LPRA sec. 455(x).

Por otra parte, la Ley establece la presunción de que "[l]a portación de un arma de fuego por una persona que no posea una licencia de armas con permiso para portar, se considerará

---

[402] Hoy derogada, pero vigente al tiempo de los hechos de este caso.

evidencia *prima facie* de que dicha persona portaba el arma con la intención de cometer delito". Art. 5.11 de la Ley 404-2000, 25 LPRA sec. 458j. Véase, además, Pueblo v. Acabá Raíces, 118 DPR 369, 375 (1987).

Para fines exclusivos del Artículo 5.04, *supra*, lo que se quiso tipificar como delito fue "[el] mero ejercicio de portar sin permiso o transportar un arma o parte de esta sin licencia". Pueblo v. Negrón Nazario, 191 DPR 720, 753 (2014). Por tal razón, el delito conlleva como elemento esencial e imprescindible, la ausencia de autorización para la correspondiente portación de arma. *Íd.*

Ahora bien, la norma es que, en casos de portación o posesión ilegal de armas de fuego, el Ministerio Público no está obligado a probar que el acusado no tenía la licencia correspondiente, cuando sí se ha probado la portación o posesión del arma, ya que una vez establecido dicho hecho, surge una presunción de portación o posesión ilegal y le corresponde al acusado destruir tal presunción. Pueblo v. Pacheco Ruiz, 78 DPR 25, 30 (1955), reiterado en Pueblo v. Nieves Cabán, 201 DPR 853, 876 (2019).

En cuanto al delito de "*apuntar armas*", el Artículo 5.15 de la referida Ley de Armas, dispone que:

> (A) Incurrirá en delito grave toda persona que, salvo en casos de defensa propia o de terceros o de actuaciones en el desempeño de funciones oficiales o de actividades legítimas de deportes, incluida la caza, o del ejercicio de la práctica de tiro en un club de tiro autorizado:
>
> (1)  Voluntariamente dispare cualquier arma en un sitio público o en cualquier otro sitio, aunque no le cause daño a persona alguna, o
>
> (2)  **intencionalmente**, aunque sin malicia, **apunte hacia alguna persona con un arma**, aunque no le cause daño a persona alguna. La pena de reclusión por la comisión de los delitos descritos en los incisos (1) y (2) anteriores, será por un término fijo de cinco (5) años.

> De mediar circunstancias agravantes, la pena establecida podrá ser aumentada hasta un máximo de diez (10) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de un (1) año. (Énfasis suplido).

### III.

En esencia, el Apelante plantea como primer error que el TPI cometió error manifiesto en la apreciación de la prueba, porque no estableció su culpabilidad más allá de duda razonable y que el error en este sentido es de tal magnitud que el resultado hubiera sido distinto de no haberse cometido. Plantea como segundo error que el TPI aplicó incorrectamente el Derecho a los hechos del caso.

Al discutir los errores señalados en conjunto, alega que se afectó su derecho constitucional a una representación legal adecuada y eficaz. Ello, porque el abogado de defensa no objetó oportunamente a lo largo de todo el juicio y no desplegó sus mejores esfuerzos para confrontar la prueba presentada por el Ministerio Público. Señala específicamente la decisión de la Defensa de estipular casi toda la prueba documental porque, al hacerlo, renunció a confrontar la manera en que se admitió dicha prueba. Sostiene que ello se permitió a un costo demasiado alto para el Apelante, y a cambio de nada. Alega que tal actuación debía hacerse de parte del Apelante con pleno conocimiento de sus efectos. Apunta que el Apelante debía saber que esa decisión liberaba al Ministerio Público de desfilar la referida prueba y evitaba que se confrontara. Plantea también que tal decisión afectó su derecho al descubrimiento de prueba.

Por otra parte, alega que las equivocaciones en la apreciación de la prueba se deben a que se extendiera el juicio por tres años. Que el abuso de discreción consiste en haber

ignorado una gran mayoría de factores importante y pertinentes mientras concedió un peso abrumador a un solo factor, a saber, algunos de los testimonios vertidos en juicio e ignoró el resto de los testimonios. Alega que, el TPI interpretó los hechos de manera incorrecta y confundida. También alega que, durante los contrainterrogatorios, el Ministerio Público objetaba constantemente sin fundamentos en Derecho, lo que impidió presentar los testimonios de los testigos. Sostiene que el TPI permitió que se argumentaran las objeciones en presencia de los testigos, lo cual tuvo el efecto de contaminar sus testimonios. En fin, alega que el TPI contribuyó, "con su inacción", a que la Defensa no pudiera realizar su trabajo.

De entrada, llama nuestra atención, que el Apelante no hizo referencia alguna a la transcripción más allá de alegar la comisión de tales errores, ni su alegato contiene un análisis preciso que permita determinar si el TPI incurrió en dichos errores. Ello, en incumplimiento con la Regla 76(C)(F) de nuestro Reglamento, 4 LPRA Ap. XXII-B, R.76(C)(F).[403]

De todos modos, al analizar la totalidad de la prueba presentada, hemos corroborado que el Ministerio Público probó, más allá de duda razonable, que en efecto el Apelante cometió todos los delitos imputados.

La Sra. Meléndez, como testigo de los hechos, poseyó un alto grado de atención y una buena oportunidad de ver al Apelante. La lectura sosegada de la transcripción del juicio revela que esta narró detalladamente los incidentes previos, coetáneos y posteriores al evento. La Sra. Meléndez observó al Apelante

---

[403] La Regla 76(C)(F) establece: Cuando en cualquier escrito se haga referencia a los hechos del caso, y existiese una transcripción de la prueba oral, deberá indicarse en cada lugar, en paréntesis, la página o las páginas de la transcripción donde aparece el testimonio que establece los hechos en cuestión.

acercarse con un arma de fuego, señalar a Andrés y dispararle, tras lo cual ella lo confrontó y observó por un espacio de tiempo suficiente porque, según declaró, lo miró directamente y le gritó tres veces, "A Andrés no" para que no lo matara.[404] En cuanto a la descripción del Apelante, indicó que el autor de los hechos era de nariz perfilada, pelo negro con un recorte "punk", tenía las cejas bien marcadas y una mirada profunda. Además, afirmó que era la misma persona que había visto esa misma noche en el Colmado y que era la misma persona sentada al lado del abogado, a quien identificó en corte abierta.[405]

En el juicio, la Sra. Meléndez fue enfática en que pudo identificar al Apelante porque lo tuvo de frente a unos tres pies de distancia y había iluminación en el lugar de los hechos.[406] Tampoco podemos ignorar que la rueda de confrontación se realizó a solo dos días después de los hechos y que la Sra. Meléndez fue contundente al identificar al Apelante como el autor de los hechos que le ocasionaron la muerte a los occisos Luna Guzmán y Vargas Ortiz y en los cuales resultó herida la Sra. Rodríguez.[407] En fin, durante su testimonio la testigo relató extensamente que el Apelante era la misma persona que se acercó a ellos y les disparó con un arma de fuego.

Por su parte, la Defensa contrainterrogó ampliamente para impugnar la credibilidad de la testigo y cuestionar la oportunidad que ésta tuvo para observar e identificar al Apelante. Todo ello fue evaluado por el TPI y, en el ejercicio de la autoridad que se le ha delegado, adjudicó los hechos que consideró probados más allá de duda razonable.

---

[404] TPO del 29 de enero de 2018, págs. 60-61.
[405] *Íd.*, págs. 61-62.
[406] TPO del 30 de enero de 2018, págs. 11 y 58.
[407] *Íd.*, págs. 78-81.

Así pues, con el testimonio de la Sra. Meléndez que fue corroborado por los demás testigos y lo investigado por los agentes que intervinieron el día de los hechos, el Ministerio Público demostró todos los elementos de los delitos imputados y su conexión con el Apelante. Dicho testimonio fue categórico y creído por el juzgador de hechos. En nuestra opinión, la prueba de cargo produce la certeza moral necesaria para llegar a la determinación de culpabilidad hecha por el TPI.

Habiendo el Ministerio Público cumplido con la carga probatoria, procedía como lo hizo el TPI, la convicción por los delitos imputados. Como sabemos, nuestro sistema de justicia criminal requiere que la prueba que presente el Ministerio Público sea suficiente en derecho respecto a todos los elementos del delito y su conexión con el acusado. Esto no implica que la culpabilidad del acusado tenga que establecerse con certeza matemática.

Por tanto, la prueba presentada y creída por el TPI apoya los fallos condenatorios, por lo que no se cometió el error señalado. Reemplazar el criterio del juzgador de los hechos exige que de los autos emane una actuación apasionada, prejuiciada, parcializada o un error manifiesto. No existen razones para que este Tribunal concluya que el TPI incurrió en ellas. La prueba, por el contrario, sustenta debidamente las convicciones. Por ello es forzoso concluir que el Ministerio Público probó, más allá de duda razonable, todos los elementos de los delitos imputados y la conexión de estos con el Apelante. El caso ante nuestra consideración no nos permite sustituir ese criterio.

Finalmente, examinamos el reclamo del Apelante de inadecuada representación legal.

La Constitución de Puerto Rico garantiza que "[e]n todos los procedimientos criminales, el acusado disfrutará del derecho a

tener asistencia de abogado". Const. E.L.A., *supra*. De ahí que el derecho a tener una adecuada representación legal en procesos de naturaleza criminal es parte fundamental del debido proceso de ley. Pueblo v. Rivera Crespo, 167 DPR 812 (2006); Pueblo v. Ortiz Couvertier, 132 DPR 883, 888 esc.3 (1993).

El derecho a tener asistencia de abogado se refiere a una adecuada representación legal. El factor determinante no será el resultado del juicio, sino que el abogado se desempeñe con un grado de competencia razonable. Este derecho puede quedar menoscabado cuando: (a) el abogado es incompetente para la tarea que se le asigna; (b) como cuestión de hecho la labor desplegada demuestra su inefectividad; (c) hay un potencial o actual conflicto de intereses para el abogado; (d) las reglas o actuaciones del tribunal constituyen una limitación irrazonable al derecho a tener adecuada asistencia de abogado. Pueblo v. Ortiz Couvertier, *supra*, pág. 888, citando a E.L. Chiesa*, Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1991, Vol. I, Sec. 7.9, págs. 449-550. Si existe el reclamo de que la asistencia legal fue inadecuada, este asunto no puede presentarse livianamente. **El acusado tiene el peso de la prueba para demostrar que no tuvo una adecuada representación legal y, de ordinario, requerirá la presentación de prueba satisfactoria a esos efectos.** (Énfasis suplido). Pueblo v. Ortiz Couvertier, *supra*, pág. 892–893. Esto debido a que la infracción al derecho a asistencia de abogado podría conllevar la revocación de una convicción, allanando el camino a su vez para la celebración de un nuevo proceso. Pueblo v. Fernández Simono, 140 DPR 514 (1996); Pueblo v. Suárez, 117 DPR 497 (1986). Por ello las alegaciones presentadas respecto a una representación legal inadecuada tienen que presentar la

especificidad necesaria para ser atendida. <u>Pueblo v. López Guzmán</u>, 131 DPR 867 (1996).

La incompetencia enervante de la asistencia legal a que tiene derecho el acusado ha de ser de grado extremo, causante de perjuicio sustancial, al punto que sostenga la probabilidad de que, de no haber incidido, el resultado del juicio hubiera sido distinto. <u>Pueblo v. Morales Suárez</u>, 117 DPR 496, 500 (1986), citando a <u>Pueblo v. Marrero Laffosse</u>, 95 DPR 186 (1967); reiterado en <u>Pueblo v. Fernández Simono</u>, 140 DPR 514, 519 (1996).

En <u>Pueblo v. Morales Suárez</u>, *supra*, págs. 501-502, el Tribunal Supremo explica:

> El criterio final para adjudicar una reclamación de falta de efectividad en la defensa debe ser si la actuación del abogado de tal modo vulneró el adecuado funcionamiento del sistema adversativo que no pueda decirse que el juicio tuvo un resultado justo. (Citas omitidas).

En este caso, el Apelante no cumplió con el peso de la prueba para demostrar la alegación de que su representación legal fue inadecuada en los procedimientos ante el TPI. A este le correspondía establecer la alegada incompetencia para derrotar la presunción de que la conducta de su abogado está comprendida dentro del amplio ámbito de una razonable asistencia legal.

El expediente demuestra que, en términos generales, el abogado objetó en varias ocasiones cuestiones relacionadas con prueba de referencia, preguntas impertinentes o repetitivas y confidencias, y el TPI adjudicó todas las objeciones. Además, el abogado que representó al Apelante presentó variados argumentos y objeciones y defendió activamente los derechos del Apelante durante el juicio. Por otro lado, destacamos que, si la representación legal decidió estipular la prueba documental, fue

una cuestión estratégica. Esto lo podemos concluir, tras observar que a los testigos presentados por el Ministerio Fiscal los contrainterrogó haciendo referencia a la prueba desfilada durante el juicio.

En fin, examinada la totalidad de la transcripción de las vistas celebradas ante el TPI, concluimos que la representación legal del Apelante fue activa, competente y adecuada. No se cometió el error señalado.

## IV.

Por los fundamentos anteriormente expuestos, confirmamos las Sentencias apeladas.

Lo acuerda y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones